604 F.2d 1102
 4 Fed. R. Evid. Serv. 1110
 UNITED STATES of America, Appellee,
v.
Michael S. WILLIAMS, Appellant.
UNITED STATES of America, Appellee,
v.
Hilton L. SMITH, Jr., Appellant.
UNITED STATES of America, Appellee,
v.
Deffanie J. MORGAN, Appellant.
UNITED STATES of America, Appellee,
v.
Norman L. WILLIAMS, Appellant.
UNITED STATES of America, Appellee,
v.
James Michael ERVIN, Appellant.
 Nos. 78-1695 to 78-1697, 78-1710 and 78-1799.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 12, 1979.
Decided Aug. 21, 1979.
As Amended Aug. 22, 1979.
Rehearing and Rehearing En Banc Denied in No. 78-1697 Sept. 4, 1979.
 
 James H. Green, Kansas City, Mo., on brief, for appellant, M. S. williams.
 E. Timothy Shea, III, Kansas City, Mo., on brief, for appellant, H. L. Smith.
 Stanley L. Wiles, Kansas City, Mo., on brief, for appellant, D. J. morgan.
 Louis Wagner, Kansas City, Mo., on brief, for appellant, N. L. Williams.
 John R. Coffin, Kansas City, Mo., on brief for appellant, J. M. Ervin.
 Floyd R. Finch, Jr., Kansas City, Mo., filed appearance form as counsel for appellant, J. M. Ervin. Mr. Coffin was permitted to withdraw as counsel for appellant, J. M. Ervin, by order of this Court.
 Before HEANEY and McMILLIAN, Circuit Judges, and SCHATZ,* District Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 Norman L. Williams, Michael S. Williams, James Michael Ervin, Hilton J. Smith, Jr., and Deffanie J. Morgan appeal from judgments entered in the district court[1] upon jury verdicts finding them guilty of conspiracy and substantive violations of federal narcotics laws. 18 U.S.C. § 2; 21 U.S.C. §§ 841(a)(1), 844(a), 846. For the reasons discussed below, we affirm in part and reverse in part.
 
 
 2
 The multi-count indictment charged appellants with participation in a heroin conspiracy and distribution scheme, operating primarily in December, 1977, and January, 1978, in Kansas City, Missouri. Norman L. Williams was characterized as the "source" or wholesale supplier; the other appellants functioned as mid-level distributors. Michael S. Williams also stored drugs at his house. As developed through the testimony of a confidential informant, James J. Jones,[2] the government showed the drug distribution network in operation in July, 1976. Jones testified that in 1976 he had witnessed several drug transactions, including one between Norman L. Williams and Michael S. Williams, and that he was a drug distributor for James Michael Ervin. Much of the evidence at trial consisted of the testimony of undercover DEA agents and local police officers and surveillance reports of the movements of appellants to and from each other's residences and places of drug transactions.
 
 
 3
 Appellants were charged as follows: Count I charged all appellants with conspiracy to distribute heroin and cocaine from June, 1976, to the date of the indictment (June 12, 1978); Count II charged Ervin with distribution of heroin on December 12, 1977; Count III charged Ervin with distribution of heroin on December 15, 1977; Count IV charged Ervin with distribution of heroin on January 20, 1978; Count V charged Ervin with distribution of heroin on January 24, 1978; Count VI charged Smith and Morgan with distribution of heroin on January 12, 1978; Count VII charged Norman Williams with distribution of heroin on January 12, 1978; Count VIII charged Smith and Morgan with distribution of heroin on January 16, 1978; Count IX charged Norman Williams with distribution of heroin on January 16, 1978; Count X charged Smith and Morgan with distribution of heroin on January 18, 1978; Count XI charged Norman Williams with distribution of heroin on January 18, 1978; Count XIII[3] charged Smith and Morgan with distribution of heroin on January 27, 1978; Count XIV charged Smith with distribution of heroin on February 2, 1978; Count XV charged Michael Williams with distribution of heroin on February 2, 1978; Count XVI charged Norman Williams with possession with intent to distribute heroin on January 19, 1978; Count XVII charged Michael Williams with possession with intent to distribute heroin on February 2, 1978; and Count XVIII charged Ervin with possession with intent to distribute cocaine on December 15, 1977.
 
 
 4
 As indicated by the counts charged, the facts in this case involved two series of narcotics transactions, that between undercover police officers Doug Clark and Earl Craven and appellants Morgan and Smith, and that between Ervin, undercover police officer William Wilson and confidential informant Jones. Both series of transactions were linked by a common source of supply, Norman Williams and occasionally Michael Williams. Therefore, we shall develop the facts separately for each series of transactions.
 
 
 5
 On December 12, 1977, confidential informant Jones initially contacted the Kansas City DEA office and indicated he wanted to cooperate with the DEA. Jones testified that he was then addicted to narcotics and unable to support his habit; had been threatened by his contact, whom he identified as appellant Ervin; and was facing several state and federal charges. On December 12, 1977, Jones, under the supervision of the DEA, telephoned Ervin to arrange a drug transaction. The conversation was tape-recorded and introduced into evidence and played to the jury.[4] Jones was fitted with a transmitting device and given prerecorded government money. Jones had arranged to meet Ervin at his (Jones') house. The DEA set up surveillance at Jones' house. Ervin arrived at Jones' house and was given the money. Ervin told Jones that he could pick up the heroin at Ervin's house later that day. Ervin later telephoned Jones and they arranged to meet at Ervin's house at 2112 East 16th Street. Jones walked to Ervin's house; Ervin arrived shortly thereafter and gave Jones the heroin (Count II).
 
 
 6
 On December 15, 1977, Jones again called Ervin to arrange another drug transaction. The conversation was made under the supervision of the DEA and recorded. Jones was fitted with the transmitting device and given prerecorded government funds. He was under DEA surveillance throughout the transaction. Jones met Ervin at a downtown street corner; they exchanged the drugs (heroin and cocaine) and money while shaking hands (Counts III and XVIII).
 
 
 7
 On January 19, 1978, Jones again telephoned Ervin to arrange another drug transaction. They agreed to meet at 16th and Woodland in Kansas City. Jones and undercover officer Wilson drove to the intersection; Ervin arrived a few minutes later. Jones went to Ervin's car and gave him the money (prerecorded government funds). Jones testified that Ervin had to pick up the drugs at "his cousin's house, Norman Lee Williams," and would be back in about an hour and a half. Jones returned to the DEA car; he and Wilson waited for Ervin to return. DEA surveillance followed Ervin's car to 2112 East 16th Street (Ervin's house). A few minutes later, Ervin left and drove to a house at 4146 College. DEA agent James Connor observed Norman Williams leaving that address about five minutes after Ervin arrived.
 
 
 8
 At this point agent Connor radioed another surveillance unit to follow Williams. Connor then radioed a marked police car to stop Williams. The marked police car stopped Williams and took him to the Linwood Boulevard Police Station for questioning. This stop will be discussed in detail below.
 
 
 9
 Later that afternoon Ervin returned to the intersection and, according to Jones' testimony, explained that something had happened and that his cousin had been picked up by the police. Ervin asked Jones and Wilson to go to his house where he would explain further. Jones and Wilson entered Ervin's house and discussed the situation. Ervin reassured them that they would get their drugs as soon as Norman Williams was released. Jones and Wilson testified that Ervin told them Norman Williams was his source and that he had given Norman Williams their money. The next day, January 20, 1978, Ervin telephoned Jones that "the package" was ready. Officer Wilson arranged to meet Ervin that day; Ervin then delivered the narcotics to Wilson (Count IV).
 
 
 10
 The final drug transaction involving Ervin occurred on January 24, 1978 (Count V). Jones informed Wilson that Ervin was interested in selling more drugs. Wilson called Ervin and arranged a meeting. Jones and Wilson met Ervin at his house early in the afternoon, about 1 p. m. Wilson paid Ervin in advance, using prerecorded government funds. Wilson testified that Ervin told him that he had to go to his source and would probably return in an hour or two, certainly before 5 p. m. Jones and Wilson left. Surveillance followed Ervin from his house to the apartment of Morgan and Smith, and then, about ten minutes later, to a house at 4010 East 123rd Street, the home of Norman Williams. Ervin then returned to Morgan and Smith's apartment, stayed only a few minutes and finally went home.
 
 
 11
 Later in the afternoon, about 4 p. m., Ervin was observed leaving his office and was followed home and then to Norman Williams' house, 4010 East 123rd Street. Ervin entered the house; ten minutes later Ervin and another man were seen leaving the house. They were followed to an address on the outskirts of Kansas City, to a house identified by Agent Connor as the home of Lorenzo Page. Less than an hour later, Ervin was seen leaving this address and was followed home. A little later Wilson arrived at Ervin's house; Ervin got in Wilson's car and delivered the drugs to Wilson.
 
 
 12
 Meanwhile, after receiving a complaint in early January, 1978, from the manager of the El Capitan Apartments about possible drug activity at the apartment of appellants Smith and Morgan, the local DEA task force began an investigation of the apartment complex using undercover police officers and surveillance. Two undercover officers, Doug Clark and Earl Craven, were introduced by the apartment complex manager, Ms. Janet Flack, to appellant Morgan on January 12, 1978. The undercover officers quickly established their interest in purchasing narcotics and successfully initiated a series of narcotics transactions.
 
 
 13
 On January 12, 1978, Craven called Morgan to arrange a drug transaction (Counts VI and VII). The conversation was recorded and admitted into evidence. Craven and Clark met Morgan at the manager's apartment and agreed to buy several grams of heroin for $500. Craven and Clark then left the apartment to get the money; they returned to Morgan and Smith's apartment. Both Morgan and Smith were there. Craven testified that Smith told them that he would have to leave the complex to pick up the drugs and asked if he could use their car. They decided to use the apartment manager's car. Smith directed them to a convenience food store and told them to wait here. Craven and Clark paid Smith and waited in the parking lot. Smith was followed by DEA surveillance to Norman Williams' address, 4010 East 123rd Street. Smith knocked but no one answered. Ten minutes later he returned to the parking lot. Smith returned the money. Craven then testified that Smith said that his man was "not home but, with a little luck," could be back at the apartment complex. They returned to the apartment complex.
 
 
 14
 As they were parking the car, Craven testified that Smith said they were "in luck," that his man was still there, and nodded toward a man standing next to a white 1975 Thunderbird. Craven identified this individual as Norman Williams. Craven and Clark gave Smith the money and arranged to meet in the manager's apartment. Craven testified that he observed Norman Williams approach Morgan and Smith's apartment, hand Morgan a white envelope as she opened the door and then went inside. Less that a minute later Smith was seen entering the apartment. A few minutes later Morgan walked over to the apartment and delivered the heroin.
 
 
 15
 On January 16, 1978, Craven and Clark arranged another narcotics transaction (Counts VIII, IX). This transaction involved the same sequence of events: the recorded telephone conversation, the meeting at Morgan and Smith's apartment, the drive to the convenience food store. Surveillance again followed Smith to 4010 East 123rd Street, Norman Williams' address; Smith was seen leaving the house accompanied by Norman Williams. Williams went back inside. Smith was followed back to the convenience store; Smith then delivered the heroin to Craven and Clark.
 
 
 16
 On January 18, 1978, Craven and Clark arranged a third transaction (Counts X, XI). During this conversation, which had been recorded and introduced into evidence, Morgan said that her source was at her apartment at that time, that she would arrange to have additional grams of heroin if they were interested, and that she would make sure he left before they came over. The surveillance unit at the apartment complex was immediately notified and Agent Connor testified that he saw Norman Williams leave the apartment complex less than an hour later. Craven and Clark arrived at the apartment about half an hour later, paid Morgan and received the heroin from her.
 
 
 17
 On January 23, 1978, Craven and Clark went to Morgan and Smith's apartment to arrange another drug transaction. As they were walking toward the apartment complex, they passed Norman Williams walking out of one of the breezeways toward the parking lot. Morgan let them into the apartment; Craven testified that she said her supplier had been arrested by the police and was being followed. She also said she had ordered their next package of heroin and would call them.
 
 
 18
 On January 27, 1978, they returned to the apartment complex. The officers advanced Smith and Morgan the necessary money, using prerecorded government funds, and were told to return after 5 p. m. Surveillance units observed Norman Williams and an unidentified man leave Norman Williams' address in a gold 1978 Monte Carlo about 5:30 p. m. That evening Clark and Craven returned to the apartment; Smith informed them there would be some delay while he picked up the drugs. About 7:30 p. m., a surveillance unit followed Smith to 1468 East 78th Street, the address of Michael Williams. The gold Monte Carlo, seen earlier that day, was parked in front of the house. Smith and two men, one wearing clothing similar to that worn by Norman Williams earlier that day, a camel-colored three-quarter length coat and matching golf cap, were seen leaving the house about 7:45 p. m. Smith returned to the apartment complex; the other men got into the Monte Carlo and drove off. Smith delivered the drugs to Clark and Craven. About 8:15 p. m., the surveillance unit at Norman Williams' address reported that the Monte Carlo had returned. Officer Cullen testified he was unable to identify the two men who got out of the car and went in the house but stated that it appeared to be the same individuals who had left earlier in the evening in the same car. About ten minutes later the man without the golf cap was seen leaving the house and driving away in the Monte Carlo.
 
 
 19
 The last transaction occurred on February 2, 1978 (Count XIV). Clark and Craven went to the apartment to set up another drug transaction. Craven testified that Morgan told them the location of the source had been changed but that it was the same man, just in a different place. Clark and Craven accompanied Smith part of the way. Smith directed them to another convenience food store. Craven testified that Smith assured them the heroin would be the same, came from the same supplier, but a different location. Clark and Craven advanced the purchase price and waited in the parking lot; Smith drove off. Surveillance units followed Smith from the convenience food store to 1468 East 78th Street, Michael Williams' address. Smith was seen entering the house and, a few minutes later, returned to the convenience food store. Smith delivered the heroin. At this point Clark and Craven arrested Smith, searched him and found another package of heroin and part of the prerecorded government funds used in the transaction.
 
 
 20
 After learning Smith had been arrested, the surveillance team at 1468 East 78th Street was instructed to "move in." The nature of this search is the subject of one of Michael Williams' arguments on appeal. The police forcibly entered the house, arrested Michael Williams and searched the house. They found heroin, a set of scales and, in Michael Willams' pocket, the balance of the prerecorded government money, which had been paid to Smith earlier that day (Counts XV, XVII).
 
 
 21
 The heroin in each of these transactions was an unusual dark brown color, an indication of relative purity, according to law enforcement officers. Craven testified that Smith described the heroin as very good and capable of being "cut" or diluted with other substances as many as three times.
 
 
 22
 Counsel for Norman Williams and Michael Williams moved to suppress evidence seized following Norman Williams' stop and arrest on January 19, 1978, and Michael Williams' arrest following the search of his house on February 2, 1978. The trial court denied both motions after the pretrial hearing.
 
 
 23
 The jury returned verdicts of guilty on all counts against all appellants. The trial court sentenced appellants as follows: Norman Williams was sentenced to two consecutive ten-year terms of imprisonment plus a three-year special parole term; Michael Williams was sentenced to a total of ten years imprisonment plus a three-year special parole term; Ervin was sentenced to a total of eight years imprisonment plus a three-year special parole term; Morgan and Smith were each sentenced to a total of ten years imprisonment plus a three-year special parole term.
 
 
 24
 We shall first discuss two issues raised by Norman Williams and Ervin but which could affect all appellants: the admissibility of coconspirators' statements and prejudicial publicity. We shall then discuss the issues raised by each appellant individually.
 
 
 25
 Admissibility of Coconspirators' Statements: Norman Williams and James Michael Ervin
 
 
 26
 Norman Williams and James Michael Ervin jointly argue that the trial court erred in its handling of the admissibility of coconspirators' statements. Appellants argue that the trial court did not require the government to establish the existence of a conspiracy by a preponderance of independent evidence before introducing coconspirators' statements, and did not make a finding on the existence of a conspiracy, but improperly permitted the jury to determine that issue. In short, appellants argue that the trial court failed to follow the procedural guidelines set forth by Senior Judge Matthes in United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978). We disagree.
 
 
 27
 Our review of the record in this case reveals that the trial court made an explicit finding for the record at the close of the government's case that there was sufficient independent evidence to establish the existence of a conspiracy. Such a finding constitutes an implicit determination on the record that the coconspirators' statements were admissible under Fed.R.Evid. 801(d)(2) (E). In our view, the trial court's finding was in compliance with the procedure outlined in the Bell case. We note that "(a)n explicit, on-the-record finding of admissibility (of coconspirators' statements) has never previously been required in this circuit. . . ." United States v. Bell, supra, 573 F.2d at 1045, Citing United States v. Kelley, 526 F.2d 615, 619 n. 3 (8th Cir. 1975), Cert. denied, 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976).
 
 
 28
 Although the parties, with the approval of the trial court, apparently agreed before trial that the government should be made to first establish the existence of the conspiracy, the government presented its case in roughly chronological order, including coconspirators' statements. There was no objection by any of the defense counsel.[5] We note that the order of proof is a matter within the discretion of the trial court; "the co-conspirator's statement may be conditionally admitted subject to being 'connected up' subsequently by independent proof of conspiracy, which may be totally circumstantial." United States v. Jackson, 549 F.2d 517, 533 (8th Cir.), Cert. denied sub nom. Muhammad v. United States, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977) (citations omitted), Cited in United States v. Lambros, 564 F.2d 26, 30 (8th Cir. 1977), Cert. denied, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978). Under these circumstances, in particular the absence of any objection as to order of proof, the trial court did not abuse its discretion in permitting the government to present its case in this manner.
 
 
 29
 The fundamental question, of course, is whether the trial court correctly determined that there was a preponderance of the independent evidence of conspiracy.
 
 
 30
 (T)he standard for the admissibility of coconspirator statements requires the showing of a likelihood of illicit association between the declarant and the defendant. The trial judge determining admissibility preliminarily has wide discretion and must be satisfied only that there is independent evidence, credible and sufficient to support a finding of a joint undertaking. The independent evidence of illicit association may be completely circumstantial, or may consist of the conspirators' own conduct and admissions.
 
 
 31
 United States v. Scholle, 553 F.2d 1109, 1117 (8th Cir. 1977), Cert. denied, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1978); See also United States v. Bell, supra, 573 F.2d at 1044; United States v. Rich, 518 F.2d 980, 984 (8th Cir. 1975). We believe the trial court was correct in its determination.
 
 
 32
 The independent evidence in the present case consists of undercover police arrangements to purchase narcotics and police surveillance of the sellers travelling to other locations, in particular to the house of appellant Norman Williams, immediately before each transaction. This pattern of activity is comparable to that in United States v. Carlson, 547 F.2d 1346 (8th Cir. 1976), Cert. denied, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977), in which we held that repeated meetings between the defendant and the individual actually making sales to police officers, at times corresponding to the times of sales, was sufficient evidence of the existence of a conspiracy to permit the admission of alleged coconspirators' statements, including a statement identifying the source by name. Similarly, in United States v. Macklin, 573 F.2d 1046, 1050 (8th Cir.), Cert. denied, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978), we noted that independent evidence of conspiracy included repeated meetings between the defendant and the sellers at the times of the sales and, significantly, that no sale could apparently be completed without the defendant. In the present case, the sales had to be postponed when Smith and Ervin drove to Norman Williams' address but were unable to make contact because no one was at home. Both transactions were successfully completed later; in one instance, Norman Williams was seen entering the apartment of Smith and Morgan immediately before Morgan delivered the narcotics. "Inability to complete a drug transaction absent an individual's participation may be considered as evidence that the necessary individual was a member of a conspiracy." United States v. Macklin, supra, 573 F.2d at 1050, Citing United States v. Collins, 552 F.2d 243, 247 (8th Cir.), Cert. denied, 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977); United States v. Hassell, 547 F.2d 1048, 1052 (8th Cir.), Cert. denied, 430 U.S. 919, 97 S.Ct. 1338, 51 L.Ed.2d 599 (1977).
 
 
 33
 In sum, we find sufficient independent evidence to establish the existence of the conspiracy and thus to warrant the admission of various coconspirators' statements implicating Norman Williams in the conspiracy. "This court has repeatedly held that statements of a coconspirator identifying a fellow coconspirator as his source of narcotics are statements made in furtherance of the conspiracy." United States v. Lambros, supra, 564 F.2d at 30, Citing United States v. Carlson, supra, 547 F.2d at 1362; United States v. Hutchinson, 488 F.2d 484, 491 & n. 16 (8th Cir. 1973), Cert. denied sub nom. Ennis v. United States, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974).
 
 
 34
 Prejudicial Publicity: Norman Williams and James Michael Ervin
 
 
 35
 Norman Williams and James Michael Ervin next argue that the trial court erred in refusing to poll the jury about a local newspaper story which developed during trial. This newspaper article appeared on the front page of the Kansas City Star in the evening edition, July 25, 1978, the second day of trial. The next morning, before commencement of trial and out of the hearing of the jury, counsel for appellant Ervin brought the newspaper account to the attention of the trial court. Counsel made a rather vague motion for a mistrial and requested the trial court to poll the jury in a manner which would avoid reference to the particular article but would ascertain whether any member of the jury had read any publication. The trial court refused to grant a mistrial or to poll the jury and noted that the jury had been repeatedly admonished not to read newspapers or listen to the news about the case and would be thoroughly instructed to consider only the evidence presented in the courtroom. The jury was not sequestered.
 
 
 36
 The newspaper article reported that the infant son of a confidential informant in an unrelated narcotics case had been killed and the mother of the child had been wounded in a shooting which the police believed to have been in retaliation for the informant's cooperation. In the present case informant Jones testified that Ervin had threatened him and his family. Appellants Norman Williams and Ervin argue that the trial court's refusal to poll the jury in the face of widespread, prejudicial publicity was "an abuse of discretion of constitutional significance." We disagree.
 
 
 37
 We note initially that the present case does not involve a claim of prejudicial Pretrial publicity, E. g., United States v. Haldeman, 181 U.S.App.D.C. 245, 559 F.2d 31 (1976), Cert. denied sub nom. United States v. Mitchell, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), but instead a claim of prejudicial publicity During trial. "The 'during trial' cases, though fewer in number, contain greater opportunities for prejudice." United States v. Williams, 568 F.2d 464, 468 (5th Cir. 1978). As noted in Williams, such information revealed during trial is more likely to remain in a juror's mind and cannot be cured by extensive voir dire or the granting of a continuance or change of venue. Id. These cases, however, usually involve either publicity directly about the defendant in the case on trial, E. g., United States v. Lord, 565 F.2d 831 (2d Cir. 1977); United States v. Perrotta, 553 F.2d 247 (1st Cir. 1977), or reference to "other crimes" or comparable incriminating information about the defendant, E. g., Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); United States v. Word, 519 F.2d 612 (8th Cir.), Cert. denied, 423 U.S. 924, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975). The allegedly prejudicial publicity in the present case concerned neither the defendants themselves nor this narcotics prosecution, but instead the tragic death of the child of an informant in another unrelated narcotics case under investigation in the same local area. The article in no way referred to any of appellants or to the trial itself. The only similarity, which appellants Norman Williams and Ervin argue is sufficiently prejudicial to warrant reversal, is a general one: the publicized incident concerned a narcotics investigation and threats to a confidential informant and his family.
 
 
 38
 " The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. . . . (E)ach case must turn on its own special facts." Marshall v. United States, supra, 360 U.S. at 312, 79 S.Ct. at 1173, Cited in United States v. Word, supra, 519 F.2d at 615. In the present case we conclude the trial court did not abuse its discretion in refusing to poll the jury.[6] The trial court correctly determined that the newspaper article in question did not constitute prejudicial publicity in this case. It was a news account totally unconnected with the present trial. In our view the newspaper article was not "inherently prejudicial" to appellants in the present case, See Gordon v. United States, 438 F.2d 858, 871-74 (5th Cir.), Cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 56 (1971). In short, the newspaper article at issue simply fails to meet a threshold test of potential prejudice to the defendants in this trial. We suggest, however, that the exposure of the jury to the same newspaper article during the trial of those individuals named in the article would necessarily present a different question. See, e. g., United States v. Lord, supra, 565 F.2d at 838 (report of stabbing of government witness).
 
 James Michael Ervin
 
 39
 For reversal appellant Ervin individually argues that (1) the trial court erred in permitting DEA agent James Connor to sit at the counsel's table, remain in the courtroom when other witnesses were excluded, and then testify; and (2) the trial court erred in refusing to compel production of government material needed for cross-examination.
 
 
 40
 Appellant Ervin argues that he was denied due process and a fair trial because DEA agent Connor was permitted to sit at the counsel's table, remain in the courtroom when the other witnesses were excluded, and testify in the government's case-in-chief. Ervin argues that DEA agent Connor's credibility was prejudicially enhanced in the eyes of the jury by this treatment. We disagree. Agent Connor was the coordinating or supervisory officer during this investigation. Rule 615 of the Federal Rules of Evidence does not authorize the exclusion of a government officer or employee who has been designated as its representative. E. g., United States v. Boyer, 574 F.2d 951, 955 (8th Cir.), Cert. denied, 439 U.S. 967, 99 S.Ct. 457, 58 L.Ed.2d 426 (1978); United States v. Maestas, 523 F.2d 316, 321 (10th Cir. 1975). Further, it is a matter within the discretion of the trial court whether to permit the government's representative to testify, even though the witness sat at the counsel's table throughout the trial. E. g., United States v. Pellegrino, 470 F.2d 1205, 1208 (2d Cir. 1972), Cert. denied, 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973); United States v. Wells, 437 F.2d 1144, 1146 (6th Cir. 1971). In the absence of any specific showing of prejudice to appellant Ervin from the action of the trial court, we find no abuse of discretion.
 
 
 41
 Appellant Ervin next argues that the trial court erred in refusing to compel production of certain government material needed to cross-examine the government witnesses. The confidential informant Jones repeatedly referred in his testimony to the threats against him allegedly made by appellant Ervin; at one point Jones mentioned that the threatening phone calls had been recorded. Defense counsel requested disclosure of any transcripts. The prosecuting attorney assured the trial court that all such information had been disclosed to defense counsel in the government's file. Subsequently, during cross-examination of Officer Wilson, defense counsel discovered a reference in a government report to a DEA-recorded phone conversation between Ervin and Jones on January 30, 1978. At this point, out of the presence of the jury, the trial court conducted a brief hearing. Defense counsel renewed his request for disclosure and production of the transcript or a continuance or a dismissal for violation of the Jencks Act, 18 U.S.C. § 3500. The prosecuting attorney indicated, however, that although the report did refer to a recorded conversation, neither his office nor the DEA could find such a transcript and again assured the trial court that it was not in their possession.
 
 
 42
 "Under the Jencks Act, after a government witness has testified on direct examination, on request the Government is required to produce any statement of the witness in its possession 'which relates to the subject matter as to which the witness has testified.' " United States v. Esposito, 523 F.2d 242, 247 (7th Cir. 1975), Cert. denied, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976) (footnote omitted). However, the government cannot produce statements it does not possess. Here, the prosecuting attorney represented to the trial court that it did not have any transcript for the conversation of January 30, 1978; "(i)n open court, the court has the right to rely upon the truthfulness of the government's statement." United States v. Fallen, 498 F.2d 172, 174 (8th Cir. 1974). Moreover, the entire government file was made available to defense counsel. We do not read appellant Ervin's argument as one accusing the government of deliberately misleading the trial court or otherwise acting in bad faith. See United States v. Smith, 552 F.2d 257, 262 (8th Cir. 1977).
 
 
 43
 Having thus disposed of all of appellant Ervin's points on appeal, we affirm the judgments of the trial court finding him guilty of conspiracy, distribution and possession with intent to distribute.
 
 
 44
 Hilton J. Smith, Jr.
 
 
 45
 In early February, 1978, undercover police officers Clark and Craven arranged a final narcotics transaction with Smith. The transaction itself followed the familiar convenience store surveillance pattern. Smith was arrested immediately after delivery (Count XIV). A search incident to arrest revealed more narcotics and $150 of the $900 in prerecorded government funds used in the transaction in Smith's possession.
 
 
 46
 For reversal appellant Smith argues that the trial court erred in (1) refusing to strike the testimony of Officer Earl Craven and (2) refusing to give an adverse inference instruction as requested by defense counsel. For the reason discussed below, we disagree.
 
 
 47
 Smith first argues that the trial court erred in refusing to strike the testimony of Officer Craven after Craven admitted that he had destroyed his original handwritten notes and those of his partner, Officer Clark, after their reports had been prepared, typed and checked against the notes for accuracy. Smith argues that the destruction of the agent's handwritten notes prevented impeachment of the agent's credibility and constituted a violation of the Jencks Act, 18 U.S.C. § 3500, and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This contention is without merit.
 
 
 48
 The Jencks Act has been interpreted to impose no duty upon law enforcement officers to retain their rough, handwritten notes after the contents have been incorporated into more formal reports and the reports are checked for accuracy, especially when the notes have been destroyed in good faith. See, e. g., United States v. Jiminez, 484 F.2d 91 (5th Cir. 1973); United States v. Lane, 479 F.2d 1134, 1136 (6th Cir.), Cert. denied, 414 U.S. 816, 94 S.Ct. 78, 38 L.Ed.2d 112 (1973), Citing United States v. Fruchtman, 421 F.2d 1019, 1021-22 (6th Cir. 1970); United States v. Terrell, 474 F.2d 872, 877 (2d Cir. 1973). There was no indication in the record that the handwritten notes had been deliberately destroyed on the eve of trial, See United States v. Lonardo, 350 F.2d 523 (6th Cir. 1965), or that the notes contained anything not contained in the reports. This is not a fact situation similar to that in United States v. Carrasco, 537 F.2d 372 (9th Cir. 1976), in which the statement of a key government witness was given to a DEA agent and then destroyed by him after preparing his report. The notes in the present case were the rough, investigative notes prepared by the officer himself. See United States v. Augenblick, 393 U.S. 348, 354-55, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); United States v. Comulada, 340 F.2d 449, 451 (2d Cir.), Cert. denied, 380 U.S. 978, 85 S.Ct. 1343, 14 L.Ed.2d 272 (1965); State v. Maluia, 539 P.2d 1200, 1208-10 (Hawaii 1975) (discussion of cases). The government in the present case allowed defense counsel access to the reports themselves. Under these circumstances, the trial court correctly refused to strike the testimony of Officer Craven.[7]
 
 
 49
 Smith next argues that the trial court erred in refusing to give to the jury an adverse inference ("absent witness") instruction. Appellant Smith argues he was thus prejudicially prohibited from commenting upon the government's failure to produce Officer Doug Clark. Appellant further argues that the government's failure to produce Officer Clark effectively restricted appellant's scope of cross-examination. Officer Clark served as Officer Craven's partner throughout this narcotics investigation. Evidently, appellant Smith's defense strategy contemplated checking the testimony of each undercover officer against that of his partner. Officer Clark was unable to testify during trial because he had been hospitalized for treatment of a back condition and for severe headaches.
 
 
 50
 The propriety of giving an "absent witness" instruction, directing the jury that failure of the prosecution to produce a witness, who is peculiarly within its power to produce, may give rise to the inference that his testimony would be unfavorable to the government, is a matter largely within the discretion of the trial court.
 
 
 51
 United States v. Johnson, 562 F.2d 515, 517 (8th Cir. 1977) (per curiam), Citing United States v. Kirk, 534 F.2d 1262, 1280 (8th Cir. 1976), Cert. denied, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977); United States v. Williams, 481 F.2d 735, 738 (8th Cir.), Cert. denied, 414 U.S. 1026, 94 S.Ct. 453, 38 L.Ed.2d 318 (1973). In the present case, the government intended to call Officer Clark as a witness but was unable to do so due to Clark's sudden illness and subsequent hospitalization. There is no suggestion in the record that Clark's illness was feigned or that he was purposely not produced as a witness. In fact, the government did produce an affidavit from Clark's physician (Exhibit 201), stating that Clark had been hospitalized for treatment of head and neck pain. None of the defense attorneys was able to articulate in what manner Officer Clark's testimony would have served to discredit Officer Craven's testimony. Moreover, as was noted by the trial court, both officers had worked closely with each other on the narcotics transactions in this case, participated in each purchase, and their testimony at the suppression hearing had been nearly identical. Appellant Smith's counsel did not seek a continuance or suggest Clark's deposition be taken at the hospital. If anything, it is more likely that Officer Clark's testimony would have corroborated Officer Craven rather than impeached him. Under these circumstances, we are unable to find that the trial court abused its discretion in refusing the "absent witness" instruction.
 
 
 52
 The judgments are affirmed.
 
 Deffanie J. Morgan
 
 53
 For reversal appellant Morgan argues the trial court erred in (1) denying her motion to dismiss the counts of the indictment charging her with conspiracy to distribute and distribution; (2) admitting into evidence a tape-recorded conversation between herself and Officer Clark; (3) restricting further cross-examination of Officer Craven about the character of Janet Flack; (4) failing to strike a prospective juror for cause; (5) denying her motion for severance; (6) striking the testimony of witness Tonya Leiblie; and (7) refusing to give to the jury several instructions, including an "absent witness" instruction. For the reasons discussed below, we reject appellant Morgan's points of error and affirm the judgments of the trial court finding her guilty of conspiracy and distribution in violation of 21 U.S.C. § 841(a) (1).
 
 
 54
 Appellant Morgan first argues that the trial court erred in denying her motion to dismiss the indictment. Morgan argues that the government's evidence was insufficient to establish the existence of a conspiracy and at the most established only that she was Smith's girlfriend and merely associated with the other named defendants. As discussed above, we reviewed the independent evidence and agreed with the trial court's determination that sufficient independent evidence established the existence of a conspiracy. "Once the existence of a conspiracy has been established by satisfactory proof, a particular individual's participation may be established by evidence that otherwise seems slight." United States v. Hassell, supra, 547 F.2d at 1052 (citations omitted), Cited in United States v. Brown, 584 F.2d 252, 262 (8th Cir. 1978), Cert. denied, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979).
 
 
 55
 Nevertheless, a defendant's participation in the conspiracy must be shown, with proof "that the defendant 'knowingly contributed * * * efforts in furtherance of it. Knowledge of the existence or acquiescence in a conspiracy does not serve to render one a part of the conspiracy. There must exist some element of affirmative cooperation or at least an agreement to cooperate.' "
 
 
 56
 United States v. Brown, supra, 584 F.2d at 262 (citations omitted).
 
 
 57
 In the present case we conclude that the evidence was sufficient to link Morgan with the conspiracy as a participant and not as a mere associate with its members. In reviewing a jury verdict of guilty, we must view the evidence in the light most favorable to the government and accept as proven all reasonable inferences in support of the jury verdict. E. g., United States v. Holder, 560 F.2d 953, 958 (8th Cir. 1977). The evidence clearly showed that Morgan negotiated and participated in several narcotics transactions with undercover police officers and that her own statements and those of the other defendants indicated that she knew she was a distributor and thus part of a larger narcotics operation. The evidence was not equally susceptible of an inference of innocence nor did it require mere speculation on the part of the jury. E. g., United States v. Kelton, 446 F.2d 669, 671 (8th Cir. 1971); But cf. United States v. Brown, supra, 584 F.2d at 262-66 (insufficient evidence of membership in conspiracy); United States v. Frol, 518 F.2d 1134, 1137 (8th Cir. 1975) (insufficient evidence of unlawful possession with intent to distribute).
 
 
 58
 Morgan next argues that the trial court erred in admitting into evidence a tape-recorded conversation between herself and Officer Clark on January 16, 1978. Morgan argues that this tape-recorded conversation was hearsay and stresses that defense counsel was unable to cross-examine Officer Clark, who was hospitalized during the trial and unable to testify. This contention is without merit; the tape-recorded conversation was not hearsay because it was admitted to provide a context for Morgan's end of the conversation, not as proof of the matters asserted therein by Officer Clark. See United States v. Abrahamson, 568 F.2d 604, 606 (8th Cir. 1978). In other words the tape-recording was admitted to prove the occurrence of the conversation, not the truth of the statements contained therein. Officer Craven testified that he had been present at the time and listened to the conversation on an extension, that the conversation was recorded under DEA supervision, and that he was able to identify the voices on the tape as Morgan's and Officer Clark's.
 
 
 59
 Morgan next argues that the trial court erred in restricting the scope of cross-examination of Officer Craven about the character and personality of apartment manager Ms. Janet Flack.[8] This contention is without merit. The trial court permitted defense counsel to cross-examine Officer Craven at length about his and Officer Clark's association with Ms. Flack. We cannot agree that the trial court abused its discretion in restricting further cross-examination. Fed.R.Evid. 611(b); E. g., United States v. Drake, 542 F.2d 1020 (8th Cir. 1976), Cert. denied, 429 U.S. 1050, 97 S.Ct. 762, 50 L.Ed.2d 766 (1977). We agree with the trial court that further inquiry would have been irrelevant.
 
 
 60
 Morgan next argues that the trial court erred in refusing to strike a juror for cause. Morgan argues that juror Helen M. Dahl should have been removed from the jury because she was employed by the IRS as a tax examiner. We disagree. "Rulings on juror qualifications will not be interfered with on appeal absent a clear showing of abuse of the sound discretion that is vested in the District Court." United States v. Young, 553 F.2d 1132, 1136 (8th Cir.), Cert. denied, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 278 (1977) (citation omitted). In the present case, after learning that Ms. Dahl was employed by the IRS, the trial court inquired whether her employment would influence her decision. Ms. Dahl responded that it would not. (Voir dire transcript p. 25). We defer to the discretion of the trial court, particularly in the absence of any showing of actual bias. United States v. Young, supra,553 F.2d at 1136.
 
 
 61
 Morgan next argues that the trial court erred in denying her motion for severance. She argues that the jury was unable to compartmentalize the evidence and that she was denied a fair trial, especially when most of the testimony concerned alleged narcotics activity with which she was unconnected. We disagree. A motion for severance is addressed to the discretion of the trial court. Fed.R.Crim.P. 14; E. g., United States v. Fuel, 583 F.2d 978, 987 (8th Cir. 1978). We note that generally persons charged in a conspiracy should be tried together, especially where proof of the charges is based upon the same evidence and acts. E. g., United States v. Smith, 578 F.2d 1227, 1236 (8th Cir. 1978); United States v. Jackson, supra, 549 F.2d at 523. Further, although "there is an inherent danger in a joint trial that the jury will convict on the basis of the cumulative evidence . . ., a defendant is not automatically entitled to a severance because the evidence against a codefendant is more damaging than the evidence against (her)." United States v. Fuel, supra, 583 F.2d at 988.
 
 
 62
 In the present case the defendants were charged with an on-going narcotics conspiracy. The evidence was complex but not so complicated that it was unreasonable for the trial court to conclude that the jury would be able to sufficiently compartmentalize the evidence as to each defendant. Moreover, we note that there was clear evidence of Morgan's participation in several narcotics transactions as well as evidence indicating more than "mere association" with the conspiracy, and that the trial court carefully instructed the jury to consider the evidence as to each defendant individually.
 
 
 63
 Morgan next argues that the trial court erred in striking the testimony of witness Tonya Leiblie. Ms. Leiblie testified that she saw what looked like a marijuana cigarette in an ashtray in Ms. Janet Flack's apartment after a visit from Officers Clark and Craven on January 11, 1978. It is evidently the theory of the defense that the undercover officers were themselves drug-users. Upon the motion of the government, however, the trial court instructed the jury to disregard Ms. Leiblie's testimony about the marijuana cigarette. The trial court noted that there was no foundation whatever connecting the marijuana cigarette with either undercover officer. After a careful reading of the record, we conclude that the trial court did not abuse its discretion in excluding the offered testimony as irrelevant. E. g., United States v. Johnson, 516 F.2d 209, 214 (8th Cir.), Cert. denied, 423 U.S. 859, 96 S.Ct. 112, 46 L.Ed.2d 85 (1975); United States v. Mitchell, 463 F.2d 187, 191 (8th Cir. 1972), Cert. denied, 410 U.S. 969, 93 S.Ct. 1449, 35 L.Ed.2d 705 (1973).
 
 
 64
 Lastly, Morgan argues that the trial court erred in refusing to give several requested instructions to the jury. The instructions included an " absent witness" instruction (based upon the alleged failure to produce Ms. Flack and Officer Clark) (instruction No. 28); an instruction that the jury is not required to accept testimony, even though uncontradicted and unimpeached (instruction No. 30); and an instruction that punishment is within the province of the court and not the jury (instruction No. 31). As discussed above, the giving of an "absent witness" instruction is a matter within the discretion of the trial court. See, e. g., United States v. Johnson, supra,562 F.2d at 517. The government intended throughout trial to call Officer Clark as a witness but was unable to do so after Officer Clark was hospitalized on the advice of his physician. There is no indication in the record that the government exercised any power whatsoever over Ms. Flack; she was not subpoenaed by the government or any of appellants. Under the circumstances, we do not find the trial court abused its discretion in refusing to give the requested "absent witness" instruction.
 
 
 65
 Nor do we find any error in the trial court's refusal to give the other two instructions requested by the defense. The trial court retains discretion in the matter of instructions and it is sufficient if the instructions given to the jury adequately and correctly cover the applicable law. E. g., United States v. Wyant, 576 F.2d 1312, 1318 (8th Cir. 1978); United States v. Brown, 540 F.2d 364, 380 (8th Cir. 1976). Furthermore, we review the instructions as a whole. In the present case, the trial court thoroughly instructed the jury about the evidence, specifically on witnesses' testimony and credibility, and emphasized its role as the sole judge of the defendants' guilt or innocence.
 
 
 66
 Accordingly, the judgments are affirmed.
 
 Michael S. Williams
 
 67
 For reversal Michael Williams argues that the trial court erred in (1) failing to suppress certain evidence and (2) denying his motion for severance. For the reasons discussed below, we find that the search of Williams' house on February 2, 1978, was unlawful and the evidence seized during the unlawful search should have been suppressed. We also find that there is insufficient evidence to support the possession with intent to distribute and distribution counts in the absence of the evidence erroneously admitted and reverse. In view of this analysis, we do not reach the severance question.
 
 
 68
 On February 2, 1978, at about 11:30 a. m., undercover Officers Clark and Craven contacted appellants Morgan and Smith about another drug transaction. The officers met Smith at the apartment complex. They drove to a convenience food store. The officers gave Smith $900 in prerecorded government funds; Smith drove off. He was followed from the parking lot to 1468 East 78th Street, Michael Williams' address, and was seen entering the house and leaving about five minutes later. He was followed back to the convenience food store. This trip took about ten minutes. Smith met Clark and Craven, completed the transaction and was arrested. Clark and Craven notified surveillance that the transaction had been completed.
 
 
 69
 Officers from the surveillance team then approached 1468 East 78th Street, under instructions to find out who was inside and to "secure" the residence. The officers walked up to the front door, knocked and identified themselves as the police, and heard a voice say, "Who is it?" They again identified themselves as the police and told the voice to open the door. Upon hearing the sound of "running footsteps," they forced open the door. The officers found Michael Williams in the dining room, dressed in a bathrobe. Williams was frisked for weapons and $750 of the prerecorded government funds given to Smith by Clark and Craven was found in his pocket. Meanwhile, other members of the surveillance team had made a "security sweep" through the rest of the house and found in "plain view" a set of scales and heroin. After the house was "secure," one officer was sent to get a search warrant. The officer returned with the search warrant and the house was searched. The officers found more narcotics, packaging materials for narcotics and a gun.
 
 
 70
 Appellant Williams argues that the search and seizure of certain items from his person and his house on February 2, 1978, was unlawful and that the items taken should have been suppressed. No search warrant or arrest warrant had been issued at the time of the warrantless entry. The government argues that the items were seized incident to a lawful arrest; that the warrantless entry was justified by exigent circumstances, specifically the threat of destruction of evidence; and that there was probable cause to believe Michael Williams was involved in the illegal distribution of narcotics under investigation. See United States v. Kulcsar, 586 F.2d 1283, 1286-87 (8th Cir. 1978); United States v. Flickinger, 573 F.2d 1349, 1354 (9th Cir.), Cert. denied, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978).
 
 
 71
 Ordinarily the findings of the trial court on a motion to suppress are subject to the clearly erroneous standard of review on appeal. United States v. Kulcsar, supra, 586 F.2d at 1286 & n.3. Here the trial court denied the motion to suppress without making any determination that exigent circumstances existed to justify the warrantless entry. Examination of the record of the suppression hearing reveals that the trial court concentrated upon the validity of the "security sweep" through the house after the arrest and whether the items seized at that time were in "plain view." We shall uphold the decision of the trial court if there is any reasonable view of the evidence to support it. See United States v. Horton, 488 F.2d 374, 380 (5th Cir. 1973), Cert. denied, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); United States v. Montos, 421 F.2d 215, 219 n.1 (5th Cir.), Cert. denied,397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970).
 
 
 72
 The question "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest" remains unresolved by the Supreme Court. United States v. Watson, 423 U.S. 411, 418 n.6, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The circuit courts have generally followed the lead of the District of Columbia Circuit in Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385, 392-93 (1970) (en banc), in which the court held that a warrantless entry to arrest the occupant of a private dwelling in the absence of exigent circumstances was unconstitutional. See note 9 Infra. This circuit has recently decided this question,[9] holding that "the warrantless intrusion into the home is one that cannot be sanctioned under the Fourth Amendment even for the purpose of private arrest, absent exigent circumstances." United States v. Houle, 603 F.2d 1297 (8th Cir. 1979); See also United States v. Kulcsar, supra, 586 F.2d at 1287; United States v. Easter, 552 F.2d 230, 233 (8th Cir.), Cert. denied, 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977) (discussion of warrantless entry to arrest suspects in private house and that burden upon government to establish exigent circumstances but without citing Dorman ); Id. at 235 (Heaney, J., dissenting); United States v. Salvador, 505 F.2d 1348, 1351-52 (8th Cir. 1974); Huotari v. Vanderport, 380 F.Supp. 645, 649 (D.Minn.1974) (Heaney, J., sitting as district judge by special designation) (explicit holding). Even assuming for the purpose of discussion the existence of exigent circumstances, the warrantless entry in the present case is unlawful because there is no probable cause.
 
 
 73
 Probable cause requires "facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing the offense.' " Gerstein v. Pugh, 420 U.S. 103, 111-12, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975), Citing Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The question is whether the law enforcement officers standing at the door had reasonable grounds to believe that Michael Williams had violated or was violating the law. See Henry v. United States,361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). A brief review of the evidence presented at the suppression hearing and at trial, excluding the evidence seized incident to the arrest in question, See Johnson v. United States, 333 U.S. 10, 15-17, 68 S.Ct. 367, 92 L.Ed. 436 (1948), persuades us that they did not. At the most the officers had grounds for mere suspicion of illegal activity. They knew only that Smith, a seller of narcotics, had visited the house before two of several narcotics transactions (on January 27 and February 2); on one of these occasions (January 27) Norman Williams, an individual reputed to be a major narcotics distributor, was observed standing on the porch; according to an informant but otherwise uncorroborated, Michael Williams was selling narcotics in 1976; and that Michael Williams lived at this address, though not alone. On these two occasions Smith was seen entering and leaving after staying only a few minutes; Michael Williams was never seen at all. No actual transaction was observed; any narcotics activity was necessarily the result of speculation on the part of the police. In fact, the police did not know who was in the house, if anyone, at the time of the warrantless entry.
 
 
 74
 Although the probable cause determination makes any discussion of exigent circumstances[10] somewhat gratuitous, we note that virtually the only factors indicative of exigency in the present case are the subject matter of the investigation, that is, narcotics, See United States v. Blake, 484 F.2d 50, 54 (8th Cir. 1973), Cert. denied, 417 U.S. 949, 94 S.Ct. 3076, 41 L.Ed.2d 669 (1974), and the officers' testimony about hearing the sound of "running feet," See Wong Sun v. United States, 371 U.S. 471, 482-83 & n.10, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Unlike Blake, there was no showing in the present case that any evidence was in "imminent danger of destruction or removal." See, e. g., Ker v. California, 374 U.S. 23, 40-41, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). There was no showing that the facts involved "compelling need for official action and no time to secure a warrant." See, e. g., Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); Warden v. Hayden, 387 U.S. 294, 299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). This is not a "hot pursuit" case and the government's reliance upon United States v. Young, supra, 553 F.2d at 1134 (shoot-out with police following bank robbery), is misplaced. Finally, we would be reluctant to find exigent circumstances, on the basis of "running feet" sounds, especially when the police precipitated such an action, and in the absence of any indication that the suspect will likely escape, knows of the presence of the police, or is reasonably believed to be armed and thus present a danger to the safety of the investigating officers.
 
 
 75
 Because the arrest was unlawful, the government cannot justify the seizure of the money as incident to a lawful arrest or the set of scales and narcotics as in plain view. The trial court erred in failing to suppress this evidence at trial. See Wong Sun v. United States, supra, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. The trial court erroneously admitted the narcotics, packaging materials and gun seized under the search warrant. The affidavit attached to the application for the search warrant included in the facts as a basis for probable cause reference to the illegally seized marked money, narcotics and set of scales. The rest of the affidavit described the two occasions on which Smith was observed entering Michael Williams' house before delivering narcotics to undercover agents. The illegally seized items cannot form the basis for the search warrant, in the absence of any showing by the government of an independent source of information. Alderman v. United States,394 U.S. 165, 177, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); United States v. Paroutian, 299 F.2d 486, 489 (2d Cir. 1962).
 
 
 76
 We do not find beyond a reasonable doubt that the introduction of this evidence at trial was harmless error. This evidence formed the basis for the possession and distribution counts; it also constituted a substantial part of the government's case against Michael Williams on the conspiracy count. However, because the remedy for illegal arrest is the suppression of any evidence obtained as a result of the arrest, See Gerstein v. Pugh, supra, 420 U.S. at 119, 95 S.Ct. 854, 43 L.Ed.2d 54, we reverse the conspiracy, possession and distribution convictions and remand for a new trial.
 
 Norman L. Williams
 
 77
 For reversal Norman Williams argues that the trial court erred in (1) refusing to suppress evidence seized in connection with an investigatory stop, (2) denying his motion for judgment of acquittal, (3) failing to grant a mistrial following evidence of other crimes, (4) restricting the scope of cross-examination of informant Jones, and (5) denying his motion to dismiss on the basis of preindictment delay. For the reasons given below, we affirm the judgment of the district court.
 
 
 78
 Norman Williams first argues that the trial court erred in refusing to suppress evidence seized in connection with an investigatory stop. Appellant argues that the investigatory stop was unlawful because the police did not have "valid cause" and therefore the evidence should have been suppressed. The government argues that the police officers lawfully stopped Williams' car on the basis of probable cause but that Williams was not arrested at that time, that Williams voluntarily accompanied the police officers to the station, and that appellant's arrest in the parking lot of the police station was based upon probable cause.
 
 
 79
 The trial court denied the motion to suppress. The record of the suppression hearing indicates that the trial court found there was probable cause to arrest either at the time Williams was stopped or later at the police station. The trial court made no determination whether Williams was in fact arrested at the time of the stop and did not address the consent question. However, we will uphold the decision of the trial court if it is supported by a reasonable view of the evidence.
 
 
 80
 There can be little doubt that, when considered alone, the police officers had probable cause to arrest appellant at the police station, based upon their observation of appellant's behavior in the car during the ride and in the parking lot. Appellant was seen handling a small bag of white powder at his feet; it was unclear whether he was taking it out of his shoe or hiding it in his sock or what. Another small bag of white powder fell to the ground when appellant was taken out of the car. Lawful police observation of these events is dependent upon the validity of the initial stop. In our view, the dispositive questions are whether the investigatory stop was lawful and whether appellant consented to accompany the police to the station for further questioning. We approach the facts in this manner because "any further detention or search (other than the sort of brief questioning characteristic of investigatory stops) must be based (u)pon consent or probable cause." United States v. Brignoni-Ponce, 422 U.S. 873, 881-82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975); Accord, Dunaway v. New York, --- U.S. ---- 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 567, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Thus, the lawfulness of appellant's continued presence in the company of the police After the investigatory stop must be based upon either consent or probable cause, regardless of whether appellant was formally arrested or involuntarily detained for further questioning. See Dunaway v. New York, supra, 99 S.Ct. at 2258.
 
 
 81
 The investigatory stop in the present case was lawful if it was made on the basis of "reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." Brown v. Texas, --- U.S. ----, 99 S.Ct. 2637, 2641 (1979), Citing Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979), And United States v. Brignoni-Ponce,supra, 422 U.S. at 882-83, 95 S.Ct. 2574. This standard appears to have been firmly established by the Supreme Court as the test for the "reasonableness of seizures that are less (intensive) than a traditional arrest."[11] Brown v. Texas, supra, 99 S.Ct. at 2640, Citing Dunaway v. New York, supra, 99 S.Ct. at 2254-56, And Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); See Delaware v. Prouse, supra, 99 S.Ct. at 1396; United States v. Stevie, 578 F.2d 204, 208 (8th Cir. 1977), Modified, 582 F.2d 1175 (1978) (en banc) (whether sufficient objective facts known to police officers justified investigatory stop for further inquiry), Cert. denied, --- U.S. ----, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). We think that the police officers in this case had a reasonable suspicion, based upon objective facts, that appellant Williams was involved in criminal activity which justified making the investigatory stop. Further, although the police acted reasonably in ordering appellant out of the car, See Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), they were not justified in conducting a limited protective search of appellant and his car for concealed weapons in the absence of reason to believe that appellant was armed and dangerous. See Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry v. Ohio, supra, 392 U.S. at 27, 88 S.Ct. 1868. It appears, however, that the narcotics and marked money introduced at trial were discovered during the search incident to appellant's arrest in the parking lot of the police station.[12] See United States v. Johnson, 563 F.2d 936, 939 (8th Cir. 1977), Cert. denied, 434 U.S. 1021, 98 S.Ct. 746, 54 L.Ed.2d 768 (1978).
 
 
 82
 The original investigatory stop was made on the basis of information known to a DEA team. We conclude that the collective information known to the team[13] was sufficient to justify a reasonable suspicion of criminal activity which warranted further investigation, but not, in our opinion, probable cause. The investigating officers knew only that Smith had referred somewhat vaguely to an individual sitting in a white Thunderbird in the El Capitan apartments parking lot as his source (Smith nodded in the direction of the car), that this individual was seen handing an envelope to Ms. Morgan (the contents, if any, of this envelope were unknown), and that Ervin was followed to 4146 College after stating he had to go to his source. Norman Williams was observed leaving the house at 4146 College shortly after Ervin arrived. We note that Norman Williams was not observed taking part in any drug transactions and that, while certainly suspicious, the significance of his movements was open to speculation. Further, the most damaging evidence of Norman Williams' drug activity was the marked money subsequently discovered in his possession. Ervin's statements to undercover Officer Wilson about Norman Williams' arrest by the police, describing the role of Williams as distributor, necessarily followed the investigatory stop.[14]
 
 
 83
 Having concluded that the police officers possessed sufficient information to form a reasonable suspicion about Norman Williams to warrant further investigation, we turn to the question of consent as a basis for Williams' continued presence in the company of the police. Williams argues that he was arrested immediately, without probable cause.[15] The government argues that Williams in fact voluntarily agreed to go to the police station for further questioning. We find implicit in the denial of the motion to suppress a finding by the trial court that, assuming appellant was not arrested until arrival at the police station, appellant voluntarily accompanied the police. The government has the burden of proving that the consent was fully and voluntarily given. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Voluntariness is "a question of fact to be determined from the totality of the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). At the suppression hearing the two police officers testified that Williams agreed to accompany them to the station for further questioning. Williams testified that he did not consent and was in fact taken involuntarily to the police station. This question of credibility was resolved against Williams. While we express some general reservations about consent given under these circumstances,[16] we cannot say that the decision of the trial court was unsupported by the record or clearly erroneous. United States v. Johnson, supra, 563 F.2d at 939; United States v. Frye, 548 F.2d 765, 770 (8th Cir. 1977).
 
 
 84
 Williams next argues that the trial court erred in denying his motion for judgment of acquittal. "In considering a motion for acquittal, the verdict of guilty must be sustained if, viewing the evidence in the light most favorable to the government together with all reasonable inferences therefrom, there is substantial evidence to support it." United States v. Frye, supra, 548 F.2d at 767. In view of the considerable evidence, including incriminating co-conspirators' statements and the discovery of marked money, we find this contention to be without merit.
 
 
 85
 Williams next argues that the trial court should have granted this motion for a mistrial following the testimony of Officer Wilson, during which Wilson stated that Ervin had told him that Williams had spent time in prison. Fed.R.Evid. 404(b). The government seeks to justify the reference to Williams' criminal past as part of an otherwise admissible coconspirator's (Ervin's) statement. We note that the trial court immediately directed the jury to ignore the reference and further instructed the jury to disregard it during their deliberations. In view of the prompt striking of the testimony and curative instruction by the trial court, we conclude the error was harmless. See United States v. Burnett, 582 F.2d 436, 439 (8th Cir. 1976) (per curiam) (defendant in prison).
 
 
 86
 Williams next argues that the trial court improperly restricted cross-examination of informant Jones. Appellant argues that because the government's case depended so heavily upon the testimony of Jones, defense counsel should have been permitted an "unfettered allowance" to prove all relevant facts. After reviewing the record, we conclude that the trial court was most indulgent in permitting cross-examination of the informant. Defense counsel thoroughly explored the informant's own criminal difficulties, pending charges, prior convictions, and drug history, and was only restricted by the trial court when the questions became obviously repetitious.
 
 
 87
 Williams finally argues that the trial court erred in denying his motion to dismiss on the ground of pre-indictment delay. Appellant argues that the period of pre-indictment delay (arrest on January 19, 1978 to indictment on June 12, 1978) plus the early trial date (trial began July 20, 1978), taken together, deprived him of the right to a fair and speedy trial. We note that this allegation of error has not been properly preserved for review; appellant failed to raise the pre-indictment delay issue before trial. Fed.R.Crim.P. 12(b); E. g., United States v. Easom, 569 F.2d 457, 459 (8th Cir. 1978). Furthermore, although we do not condone unreasonable pre-indictment delay, See United States v. Quinn, 540 F.2d 357, 363 (8th Cir. 1976) (Heaney, J., dissenting) (more than one year delay), we note that appellant has in any event failed to show any delay-related prejudice or to demonstrate intentional delay on the part of the government. See United States v. Smith, supra, 552 F.2d at 262; United States v. Quinn, supra, 540 F.2d at 360 & n.2.
 
 
 88
 Accordingly, the judgments of conviction of Norman Williams, James Michael Ervin, Deffanie J. Morgan, and Hilton L. Smith, Jr., are affirmed; the judgment of conviction of Michael S. Williams is reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska, sitting by designation
 
 
 [1]
 The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri
 
 
 [2]
 Evidently a combination of personal problems prompted Jones to contact the Drug Enforcement Administration (DEA) in Kansas City, Missouri
 
 
 [3]
 Count XII charged Norman Williams with another count of distribution of heroin on January 23, 1978; this count was dismissed
 
 
 [4]
 Transcripts of the tapes were distributed to the jury when the tapes were played but were not admitted into evidence. The trial court instructed the jury that the tapes, not the transcripts, were the exhibits. The transcripts were collected from the jury after the tapes were played. See United States v. Smith, 578 F.2d 1227, 1230 n.3 (8th Cir. 1978)
 
 
 [5]
 Counsel for appellant Smith made a running objection on the basis of hearsay early in the government's presentation of its case, but this running objection did not go to the order of proof
 
 
 [6]
 We suggest that in those cases where it appears the jury may have been exposed to prejudicial publicity, the better practice is to poll the jurors individually by asking a general question, such as, "Did you read the paper yesterday evening?" See United States v. Word, supra, 519 F.2d at 615 & n. 5
 
 
 [7]
 We do not decide whether, in the future, the rough notes of law enforcement officers, even though incorporated into reports disclosed during trial, should be retained and produced at trial. It is the opinion of the writer that such would be a better practice than routine destruction. See United States v. Harris, 560 F.2d 148 (3d Cir.) (per curiam), Cert. denied, 434 U.S. 986, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977), Explained further in United States v. Vella, 562 F.2d 275 (3d Cir. 1977) (per curiam), Cert. denied, 434 U.S. 1074, 98 S.Ct. 1262, 55 L.Ed.2d 779 (1978); United States v. Harris, 543 F.2d 1247 (9th Cir. 1976); United States v. Harrison, 173 U.S.App.D.C. 260, 524 F.2d 421 (1975)
 
 
 [8]
 Defense counsel was attempting to develop the possibility that Ms. Flack, not Ms. Morgan, was the seller of narcotics and that Ms. Flack's relationship with Officers Clark and Craven was more intimate than that of a confidential informant
 
 
 [9]
 In the opinion of this writer, this circuit answered the warrantless entry to arrest question indirectly in Salvador and Kulcsar by adopting the probable cause-exigent circumstances analysis set forth in the Dorman case. This circuit's express acknowledgement of this analysis in Houle did not involve much more than recognition of the implications of the analysis followed in those two cases. See United States v. Reed, 572 F.2d 412, 417-25 (2d Cir.), Cert. denied sub nom. Goldsmith v. United States, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978) (excellent discussion; express holding that warrantless entry to arrest suspect in home, in absence of exigent circumstances, was unconstitutional); Accord, United States v. Killebrew, 560 F.2d 729, 733 (6th Cir. 1977); United States v. Calhoun, 542 F.2d 1094, 1102-03 (9th Cir. 1976), Cert. denied, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977); People v. Ramey, 16 Cal.3d 263, 127 Cal.Rptr. 629, 545 P.2d 1333 (in bank), Cert. denied, 429 U.S. 929, 97 S.Ct. 335, 50 L.Ed.2d 299 (1976); Commonwealth v. Forde, 367 Mass. 798, 329 N.E.2d 717 (1975). See also United States v. Davis, 461 F.2d 1026 (3d Cir. 1972); Vance v. State of North Carolina, 432 F.2d 984 (4th Cir. 1970)
 
 
 [10]
 In Dorman Judge Leventhal set forth the following considerations as relevant in determining whether a warrantless entry by the police to arrest a suspect in a private dwelling is reasonable under the fourth amendment: (1) whether a grave offense, in particular a crime of violence, is involved; (2) whether the suspect is reasonably believed to be armed; (3) whether a clear showing of probable cause to believe that the suspect committed the crime involved is made; (4) whether there is strong reason to believe the suspect is in the premises being entered; (5) whether a likelihood exists that the suspect will escape if not swiftly apprehended; and (6) whether the entry, though not consented, is made peaceably. 435 F.2d at 392-93. Another consideration is the time of the entry, Id. at 393, because an entry at night raises "particular concern over its reasonableness." Id., citing Jones v. United States, 357 U.S. 493, 499-500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). A review of the facts in the present case under this analysis persuades us that, even assuming there was probable cause, which is typically conceded by the parties, E.g., United States v. Kulcsar, supra, 586 F.2d at 1287; United States v. Reed, supra, 572 F.2d at 418 n.4, there were no exigent circumstances which would have justified the warrantless entry to arrest Michael Williams in his house. In particular we note that although narcotics offenses are without doubt very serious, there was no indication that violence had been associated with the investigation or with Michael Williams. There was no information as to whether Michael Williams was armed or was believed to be armed. As discussed in the text, there was no minimum showing of probable cause, much less the requisite clear showing, that Michael Williams committed or was committing any crime. Further, the police officers did not know whether Michael Williams was at home at the time or who was in the house. There was no indication that Michael Williams was aware of the surveillance by the police or the presence of the police on February 2; there was some indication that Norman Williams feared he was being watched by the police. Finally, the entry was not peaceable; the police broke down the door
 
 
 [11]
 The writer views this development with some alarm as yet a further expansion of the very narrow exception set forth in Terry v. Ohio and the border cases, See United States v. Martinez-Fuerte, supra, 428 U.S. 543, 96 S.Ct. 3074; United States v. Brignoni-Ponce, supra, 422 U.S. 873, 95 S.Ct. 2574. "It seems that the delicate balance that Terry struck was simply too delicate, too susceptible to the 'hydraulic pressures' of the day." Adams v. Williams, supra, 407 U.S. at 162, 92 S.Ct. 1921, 1931 (Marshall, J., dissenting), Citing Terry v. Ohio, supra, 392 U.S. at 39, 88 S.Ct. 1868 (Douglas, J., dissenting); See id. at 151-53, 88 S.Ct. 1868 (Brennan, J., dissenting), Citing 436 F.2d 30, 35-39 (2d Cir. 1971) (Friendly, J., dissenting); Pennsylvania v. Mimms, supra, 434 U.S. at 112-13, 98 S.Ct. 330 (Marshall, J., dissenting), Id. at 122-23, 98 S.Ct. 330 (Stevens, J., dissenting)
 
 
 [12]
 At the suppression hearing Officer Kaestner testified that he frisked appellant for weapons and noticed something in appellant's pocket at that time. Appellant testified that the police officer found his money and took it. Kaestner further testified that he had taken the money but returned it. In any event, the serial numbers of the money were checked after the police arrested appellant at the police station and seized the money incident to arrest
 
 
 [13]
 E. g., Brewer v. Wolff, 529 F.2d 787, 790 (8th Cir. 1976)
 
 
 [14]
 We note that the police officers' version of the nature of the investigatory stop differed sharply from Norman Williams'. Specifically, Williams testified that the police cars blocked the road, that the police officers approached with their guns drawn, and that they informed him that they were investigating a robbery. The police officers contradicted this testimony. The investigatory stop occurred about 1:00 p. m.; Ervin talked to Wilson later in the afternoon, about 4:30 p. m
 
 
 [15]
 We note that in many respects the custodial sequence of events in the present case parallels that in the recent Supreme Court case Dunaway v. New York : the suspect was not questioned briefly on the spot, he was not handcuffed, he was transported to the police station in a police car (Norman Williams sat in the front passenger seat), he was not told he was under arrest or that he was "free to go." 99 U.S. at 2256. We do not know whether Norman Williams would have been physically restrained if he had tried to "escape." Williams was booked on suspicion of possession of contraband, later released, and was not charged. In Dunaway, the lower courts found the petitioner did not accompany the police voluntarily and "treated the case as an involuntary detention justified by reasonable suspicion." Id. 99 S.Ct. at 2253 n.6, Citing People v. Dunaway, 61 App.Div.2d 299, 302-03, 402 N.Y.S.2d 490, 492 (1978). There is no indication in the record that Williams was given the Miranda warnings
 
 
 [16]
 Cf. Brown v. Illinois, 422 U.S. 590, 601, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (custodial interrogations); Oregon v. Mathiason, 429 U.S. 492, 496, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (Marshall, J., dissenting) (whether suspect in custody); See ALI, Model Code of Pre-Arraignment Procedure § 2.01(3), p. 91 (Tentative Draft No. 1, 1966) (asking person to come to police station "may easily carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen")