_____

No. 94-2275
_____

United States of America,      *
                               *
        Plaintiff-Appellee,    *       Appeal from the United States
                               *       District Court for the
     v.                        *       Eastern District of Missouri.
                               *
Enrique Flores, Jr.,           *
                               *
        Defendant-Appellant.   *

_____

Submitted:  September 13, 1995

Filed:  January 17, 1996
_____

Before LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

HANSEN, Circuit Judge.

Enrique Flores, Jr., appeals from the final judgment entered by the district court[1] after a jury found him guilty of conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841 and 846. Flores contends that the district court abused its discretion by declining to grant a mistrial after a government witness volunteered certain testimony. Flores also makes various challenges to his sentence. We affirm.

_____

[1]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern and Western Districts of Missouri.

Viewed in the light most favorable to the verdict, the evidence shows Flores became involved in a highly structured, well organized, and intricate marijuana distribution conspiracy which distributed tons of marijuana throughout the United States. We limit our discussion only to those facts that are necessary to resolve the issues that Flores raises on appeal.

Part of the marijuana distribution activities were conducted in and around Cape Girardeau, Missouri. Cape Girardeau sits on the Mississippi River, which serves as the Illinois-Missouri border. The marijuana was transported from south Texas in specially built, vacuum-sealed metal containers concealed in loads of produce (tomatoes and bananas), which were hauled by semi-truck to Cape Girardeau (among other locations across the country). The driver of the truck (who received $15,000 per load transported) or his co-conspirator passenger, would then notify the local contact of the shipment's arrival. The contact would meet the truck driver and take the load of marijuana to a warehouse located on a secluded farm in nearby southern Illinois, where it was unloaded and stored. The marijuana would later be distributed to buyers, who came from all over the United States. In mid-February of 1993, two separate shipments totaling approximately 2028 lbs. (919.99 kilograms) of marijuana were delivered to the warehouse.[2] All told, the conspiracy distributed at least 25,000 pounds of marijuana during its existence.

Jose Trevino, and to a somewhat lesser extent his brother Jaime Trevino, were principals in the marijuana operation, which was headed by a man called "Mr. J," known to the authorities as one

---

[2]This quantity was the basis for the district court's calculation of Flores' base offense level.

Johnny Rodriguez.  In February of 1993, Jaime Trevino contacted the appellant, Flores, a longtime friend, and inquired whether Flores was interested in purchasing marijuana.  Jaime Trevino informed Flores that his brother, Jose, was involved in a marijuana distribution organization that was capable of supplying large quantities of marijuana.  Flores responded that he knew a person in Michigan who might be interested in purchasing quantities of marijuana and agreed to provide his Michigan contact with this market information.  Flores' Michigan contact was later identified as one Roger Jackson.  Jaime Trevino told Flores to inform his Michigan contact that if the contact was interested in purchasing a quantity, the transaction would take place in Cape Girardeau.  Flores passed this information along to Jackson, who expressed an interest in making a purchase.

Flores later met with the Trevinos to set up the arrangements for the transaction, as well as to discuss the quantity and quality of the marijuana that the organization had available for sale.  After the Trevinos and Flores finalized their plans, Flores provided Jackson with the information and requested that Jackson wire money to Harlingen, Texas, so Flores could purchase an airline ticket to fly to Cape Girardeau.  Accordingly, Jackson sent $750 and Flores bought an airline ticket.

On March 7, 1993, Jaime Trevino contacted Flores and informed him that arrangements had been made for the Trevinos and Flores to travel to Cape Girardeau the following day.  Flores was to instruct Jackson to meet them there so that the deal could be completed.  The next day, on the way to Cape Girardeau, the Trevinos and Flores stopped at the Harlingen airport where Flores obtained a cash refund for his airline ticket in order to provide the Trevinos and Flores with expense money for the trip.  The three later stopped in Hope, Arkansas, where Flores again called Jackson to confirm that the transaction would take place.  During the trip, the three

-3-

agreed that Flores would pay the Trevinos $80,000/100 lbs. of marijuana, and Flores could in turn determine the price he wished to charge Jackson. Flores determined the price that he would charge Jackson would be $85,000/100 lbs.

The Trevinos and Flores arrived in Cape Girardeau on March 9, 1993, and checked into a local motel. Jose Trevino met with one Michael Hartwick, who was in charge of storing the marijuana at the nearby Illinois warehouse. They discussed the marijuana transactions that were to take place in the next couple of days, several of which were large scale, involving brokers and dealers from other states, as well as the general operation of the distribution ring. Flores was present at various times during this conversation. At some point, Flores again called Jackson to confirm that the marijuana deal would be conducted.

Later that same day, Flores informed Jaime Trevino that Jackson had arrived and that they could proceed with the transaction. Flores gave Jaime Trevino the keys to Jackson's car, and the car was taken to the Illinois marijuana warehouse, where 239 pounds of marijuana were loaded into it. Jaime Trevino then drove Jackson's car back to Cape Girardeau, intending to return to the motel. However, Trevino spotted a law enforcement vehicle near the motel and so he parked the car in a Wal-Mart parking lot several blocks away. Trevino returned to the motel and explained what had happened to Flores. Flores instructed Trevino to immediately return the vehicle to the motel parking lot. Jaime Trevino did so and gave Jackson's car keys to Flores.

While Jackson's vehicle was being loaded with the marijuana, Flores paid Jose Trevino $80,000 for 100 lbs. of marijuana. When Jaime Trevino arrived back at the motel, Flores explained to Jackson that the charge was going to be $85,000 for 100 lbs., and that the remaining quantity of marijuana (139 lbs. worth

-4-

approximately $118,150) would be "fronted," i.e., provided on credit, to him. After completing the transaction, Flores returned Jackson's car keys to him. Later, when Jose Trevino was directed to deliver the proceeds from the sale to Jackson to two of Mr. J.'s couriers at the St. Louis airport, Flores arranged for Jackson to ride along with him and Trevino so Jackson could fly back to Michigan. After dropping Jackson off, Trevino and Flores met the two couriers when their flight arrived and Flores was present in the pickup truck when Trevino told the couriers he had the money to give to them.

The conspiracy came to an abrupt end in the early morning hours of March 11, 1993, when law enforcement officers, who had been conducting surveillance of the activities of the operation, arrested a number of individuals. Flores was among those arrested, and approximately $4,900 in cash was recovered from his gym bag in his motel room.

Flores was subsequently charged in a one-count superseding indictment with conspiracy to distribute in excess of 1,000 kilograms of marijuana in violation of 21 U.S.C. §§ 841 and 846. A jury found him guilty of the charge. At sentencing, the district court determined that Flores' base offense level was 30 and then applied a three-level upward adjustment after determining that Flores was a manager or supervisor of the criminal activity within the meaning of U.S.S.G. § 3B1.1(b). Flores' total offense level of 33, combined with his criminal history category of IV, generated a Sentencing Guidelines range of 188 - 235 months. The district court sentenced Flores to 200 months of imprisonment. Flores appeals.

A. District Court's Failure to Grant a Mistrial

Flores contends that the district court abused its discretion by denying his motion for a mistrial after prosecution witness Jaime Trevino gave certain testimony. At trial, the following exchange took place on direct examination between the prosecutor and Trevino:

>        MR. FAGAN (prosecutor): Can you describe your relationship with [Flores]?
>
>        MR. TREVINO (witness): We have been friends. We have -- I have sold marijuana to him, and he has sold marijuana to me. We have done several drug deals.

(Trial Tr. at 5-177.) At this point, Flores' counsel objected and a sidebar conference ensued. Flores claimed that this testimony was prior bad acts evidence under Federal Rule of Evidence 404(b),[3] and that the prosecution had failed to comply with the notice requirements of that provision. Flores strenuously demanded that the district court immediately declare a mistrial.

---

[3]Federal Rule of Evidence 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

The prosecutor responded that, although he knew of the existence of this evidence, the government had not intended to introduce it at trial, and in fact, the prosecutor stated that he had expressly instructed the witness not to go into these matters. Thus, according to the prosecutor, he had no duty to disclose this information in advance of trial. The district court determined that the government's explanation was credible and declined to grant a mistrial. The court stated that it felt that an admonition to the jury to disregard the testimony would only serve to highlight it, and accordingly, gave no admonition to the jury. The court also stated that it would give the jury a curative instruction if Flores so desired, and the court extended the invitation to Flores' counsel to submit such an instruction to the court for consideration. Flores' counsel initially indicated that he would submit a proposed instruction to the court but then later indicated that a curative instruction would not be sufficient to cure the prejudice and that a mistrial was the only satisfactory remedy. In any event, Flores' counsel never submitted a proposed instruction, and the district court did not give one specifically tailored to Trevino's testimony.

Flores argues that this testimony was inadmissible prior bad acts evidence under Rule 404(b) or, in the alternative, even if the evidence was properly admissible under that rule, the government's failure to comply with the notice requirements of that provision prejudiced him. In either event, Flores contends that the district court should have granted a mistrial.

"`We will affirm a district court's ruling on a motion for a mistrial absent an abuse of discretion.'" United States v. Fregoso, 60 F.3d 1314, 1328 (8th Cir. 1995) (quoting United States v. Adams, 37 F.3d 383, 384 (8th Cir. 1994)). "The district court is in a far better position to measure the effect of an improper question on the jury than an appellate court which reviews only the

cold record." United States v. Nelson, 984 F.2d 894, 897 (8th Cir.) (internal quotations omitted), cert. denied, 113 S. Ct. 2945 (1993). Finally, we have observed that measures less drastic than declaring a mistrial, for instance giving the jury a curative instruction, ordinarily alleviate any prejudice flowing from improper testimony. See id. ("[t]he admission of allegedly prejudicial testimony is ordinarily cured by an instruction to the jury to disregard the testimony.").

In the present case, the district court offered to give the jury a curative instruction and indicated that it would consider any instruction submitted by defense counsel. Because such an instruction would ordinarily be sufficient to cure the alleged prejudice, Flores' position at trial of a mistrial-or-nothing precludes us from finding in his favor on this issue. Given the district court's vantage point, we afford that court wide latitude in determining whether a mistrial is the appropriate remedy in these circumstances or whether other measures will be sufficient. Accordingly, we hold that the district court did not abuse its discretion in declining to grant a mistrial in this case. We note that the court did, in its final instructions, give the jury an instruction which told them that any evidence they had heard about Flores having committed a similar act in the past could not be used to determine whether he committed the acts charged in this case. (See Jury Inst. 11, Trial Tr. Vol. 12 at 180-81.) Although the court gave this instruction because of Rule 404(b) testimony given by one Jesus Riojas which, if believed, showed that Flores had been involved in attempting to provide his Michigan customer, Jackson, a large quantity of marijuana approximately one year prior to the events in this case, the language of the instruction was broad enough to encompass Jaime Trevino's volunteered statements about his prior drug dealings with Flores as well.

In any event, assuming an error occurred, such error was harmless.  See United States v. DeAngelo, 13 F.3d 1228, 1233 (8th Cir.), cert. denied, 114 S. Ct. 2717 (1994).  As we pointed out in DeAngelo, trial errors that do not affect constitutional rights are subject to Fed. R. Crim. P. 52(a)'s harmless error standard, under which "`[a]n error is harmless if the reviewing court, after reviewing the entire record, determines that no substantial rights of the defendant were affected, and that the error did not influence or had only a slight influence on the verdict.'"  Id. (quoting United States v. Flenoid, 949 F.2d 970, 973 (8th Cir. 1991)).  "[W]e determine the prejudicial effect of any allegedly improper testimony on the defendant's right to a fair trial by examining the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of the [defendant's] guilt."  Nelson, 984 F.2d at 897.

After carefully reviewing the record, we believe that Jaime Trevino's testimony about Flores' past drug activities would have had, at most, only a slight influence on the verdict, particularly in view of Riojas's properly admitted 404(b) testimony.  The challenged Trevino testimony was brief and given in the middle of a lengthy, twelve-day, multi-defendant drug conspiracy trial.  After this testimony was given, it appears that no further reference was made to these matters by the government or any witness during the remainder of the trial.  On the other hand, the evidence of Flores' guilt was very strong:  Three co-conspirators testified regarding Flores' direct involvement in the conspiracy; Flores traveled approximately a thousand miles from south Texas to Cape Girardeau with the Trevinos and stayed in a hotel with the Trevinos while they distributed and attempted to distribute large quantities of marijuana; and finally, when Flores was arrested, he possessed $4900, which matches almost dollar-for-dollar the profit he would have reaped from his transaction with Jackson.  Given this state of the record, with the evidence of Flores' guilt

-9-

substantiated, corroborated, and essentially uncontradicted, any error that occurred was harmless.

Flores also seems to complain that he was prejudiced because the district court did not admonish the jury to disregard Jaime Trevino's volunteered statements. As noted above, the district court declined to give the jury an admonition because the court believed that such a measure would only highlight the allegedly improper testimony. Flores made no objection to the court's course of action and, in fact, during counsel's zealous argument in favor of a mistrial, appeared to agree, at least tacitly, that an admonition would not be appropriate. Again, Flores' stance at trial contradicts the position he takes on appeal and precludes us from ruling in his favor.

This testimony was simply one of those unexpected developments that occurs in the course of a trial which, as many trial judges and lawyers will attest to, is not an infrequent occurrence. "[I]nstances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently." Bruton v. United States, 391 U.S. 123, 135 (1968). However, the Supreme Court has repeatedly made clear that a criminal defendant is entitled to "`a fair trial, not a perfect one.'" Id. (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)). That right was not violated in this case.

B. Sentencing Issues

Flores makes several challenges to his sentence. First, he contends that the district court improperly calculated the quantity of marijuana attributable to him in determining his base offense level. Preliminarily, we observe that while the jury determines whether the defendant is a member of a drug conspiracy charged in

the indictment, it is left to the district court to determine the appropriate quantity of drugs involved in the conspiracy which is to be attributed to that defendant.  See United States v. Behler, 14 F.3d 1264, 1272-73 (8th Cir.) (recognizing that district court makes drug quantity determination after jury makes guilt-innocence finding), cert. denied, 115 S. Ct. 419 (1994).  The district court's drug quantity determination is a factual finding that we review under the clearly erroneous standard.  United States v. Bieri, 21 F.3d 811, 817 (8th Cir.), cert. denied, 115 S. Ct. 208 (1994).  We will reverse a drug quantity finding only if we are firmly convinced that a mistake has been made.  United States v. Maxwell, 25 F.3d 1389, 1397 (8th Cir.), cert. denied, 115 S. Ct. 610 (1994).

U.S.S.G. § 1B1.3 provides that a criminal defendant convicted as a co-conspirator may be held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B); see also United States v. Karam, 37 F.3d 1280, 1289 (8th Cir. 1994), cert. denied sub nom. El Hani v. United States, 115 S. Ct. 1113 (1995).  Under this provision, a conspiracy defendant may be held accountable for the criminal activities of other co-conspirators provided the activities fall within the scope of criminal activity the defendant agreed to jointly undertake.  U.S.S.G. § 1B1.3 (n.2).  "In drug conspiracies, the district court may consider amounts from other drug transactions, provided the other dealings are part of the same course of conduct or scheme."  Bieri, 21 F.3d at 817.

Further, a defendant is accountable only for those activities of co-conspirators which were reasonably foreseeable in relation to the criminal activity the defendant agreed to jointly undertake.  United States v. Rogers, 982 F.2d 1241, 1246 (8th Cir.), cert. denied, 113 S. Ct. 3017 (1993).  "Relevant to a determination of

-11-

reasonable foreseeability is whether or to what extent a defendant benefitted from his co-conspirator's activities." United States v. Rice, 49 F.3d 378, 382 (8th Cir. 1995), cert. denied, 115 S. Ct. 2630 (1995).  "An additional relevant factor is whether the defendant demonstrated a substantial level of commitment to the conspiracy."  Id. at 383.

The presentence report (PSR) recommended that Flores be held accountable for approximately 2028 lbs. (919.99 kilograms) of marijuana, which represents the amount of marijuana delivered to the Illinois warehouse in mid-February of 1993.  The district judge, after reviewing his notes from trial, the case file, the PSR, and objections to the PSR, determined that this quantity of marijuana was reasonably foreseeable to Flores and, accordingly, adopted the recommendation in the PSR.  Significantly, the district court held Flores accountable only for the quantity of marijuana that was stored in the southern Illinois warehouse in close proximity to when Flores traveled to Cape Girardeau.  Flores was not held accountable for the total scope of all of the illegal activities conducted by Jose Trevino or other members of Mr. J's organization.

Flores contends that the district court's quantity calculation was clearly erroneous because the scope of the criminal activity he agreed to participate in was limited to the one transaction he arranged with Jackson.  Thus, the additional quantities the district court attributed to him were erroneous.  In making this argument, Flores claims that his conduct is indistinguishable from that outlined in several Sentencing Guidelines illustrations,[4] in each of which the Sentencing Commission suggests that the defendant is accountable for less criminal activity than other joint actors.

---

[4]Specifically, Flores cites U.S.S.G. § 1B1.3, comment. (n.2), illus. (c)(3), (5), and (7).

Flores finally contends that the quantities which exceed that involved in the transaction with Jackson were not reasonably foreseeable to him in light of the criminal activity he jointly undertook.

After conducting our own independent, careful review of the record, we cannot conclude that the district court's drug quantity calculation was clearly erroneous. First, we reject Flores' claim that the quantities attributed to him were not within the scope of the criminal activity in which he agreed to participate. In doing so, we find his conduct readily distinguishable from the Guidelines Commentary illustrations he cites. In each of the cited examples, the defendant's initial agreement to join, and subsequent involvement in, the joint criminal conduct was clearly defined from the outset as limited to the specific criminal act(s) which the defendant undertook. In such instances, it would of course be proper to hold the defendant accountable only for the limited part of the joint criminal conduct which the defendant agreed to join and actually participated in.

Flores, however, had no such limited agreement, explicit or implicit, when he joined the conspiracy, viz., that he was only in for a single deal. Nowhere in the record does it appear, and Flores offers no record support, that his agreement to become involved in the marijuana distribution ring was limited to arranging a single, one-time transaction with Jackson. We think a fair reading of the record supports the conclusion that Flores intended to conduct future transactions with the Trevinos and was simply deprived of the opportunity to do so because he was arrested before additional transactions could be made. Thus, we find unpersuasive Flores' argument that the scope of the criminal activity he agreed to participate in was limited to the one-time transaction with Jackson when he got caught and that accordingly

his conduct is indistinguishable from the Guidelines Commentary illustrations he cites.

Further, we conclude that the quantity attributed to Flores was reasonably foreseeable to him in light of the joint criminal activity Flores agreed to undertake. The quantity of marijuana attributed to Flores was derived from two deliveries that were made to the Illinois warehouse in mid-February of 1993, at about the time that Flores became a part of the conspiracy. Flores was aware that the marijuana he distributed to Jackson would come from a secluded warehouse in Illinois and, based upon his knowledge that the marijuana operation could readily satisfy orders for large quantities of marijuana, he had to have realized that significant quantities were stored there. He also was aware of the relative size and scope of the marijuana enterprise when he became involved in it. The record supports the conclusion that Flores knew that his customer was not the only individual who was going to be serviced by the Illinois warehouse during the time the Trevinos and Flores were in Cape Girardeau.

Additionally, Flores demonstrated a substantial level of commitment to the conspiracy, traveling with the Trevinos from Harlingen, Texas, to Cape Girardeau, Missouri (a distance of approximately 1000 miles), in order to help sell the contents of the Illinois warehouse, as well as cashing his airline ticket to provide financing for himself and the Trevinos during their long distance journey to Cape Girardeau. See Rice, 49 F.3d at 383 (holding defendant demonstrated substantial level of commitment to conspiracy because he accompanied co-conspirator to California to meet with other co-conspirator). Finally, Flores was able to derive substantial benefits from the activities of his co-conspirators, as he had access to a large supply of marijuana and took advantage of the already established method of distribution which permitted the transaction to be completed with a minimal

chance of detection.  Given this state of the record, we cannot say that the district court's drug quantity calculation was clearly erroneous.

In a related vein, Flores contends that the district court did not comply with the requirements of Federal Rule of Criminal Procedure 32(c)(1).[5]  This provision requires that when a defendant disputes factual matters contained in the PSR, the district court must either make specific findings with respect to the controverted matter or state that the matter will not be considered in imposing sentence.  United States v. Fetlow, 21 F.3d 243, 248 (8th Cir.), cert. denied sub nom. Ferguson v. United States, 115 S. Ct. 456 (1994).  We have held the requirements of this rule to be satisfied where the district court made clear at sentencing that it was relying on its impression of the testimony of the witnesses at trial, coupled with its specific rejection of the defendant's quantity objections.  United States v. Edwards, 994 F.2d 417, 423 (8th Cir. 1993), cert. denied, 114 S. Ct. 701 (1994).

In this case, the district court expressly acknowledged Flores' objection to the quantity of marijuana the PSR recommended be attributed to him.  The court then explicitly rejected Flores' objection to the PSR, based upon the record and the court's notes of the various witnesses' trial testimony.  Under these circumstances, we have no difficulty in concluding that the district court complied with the requirements under Rule 32(c)(1).

Flores next contends that the district court erred in assessing a three-level upward adjustment to his base offense level pursuant to U.S.S.G. § 3B1.1(b) for his role in the offense, after determining that he was one of the managers or supervisors within

---

[5]The substance of Rule 32(c)(1) was previously contained in Federal Rule of Criminal Procedure 32(c)(3)(D).

the single conspiracy charged in the indictment.  Flores also argues that the district court erred in failing to grant him a two-level downward adjustment under § 3B1.2(b) for being a minor participant in the offense because his involvement in the conspiracy was limited to the single transaction with Jackson.  The district court stated that Flores' role as a "middleman" in arranging the deal with Jackson, together with the manner in which Flores orchestrated the execution of the transaction, made the imposition of the three-level upward adjustment appropriate and precluded a two-level downward adjustment.

A sentencing court's determination of a participant's role in the offense pursuant to U.S.S.G. § 3B1 is a factual finding that we review for clear error.  Maxwell, 25 F.3d at 1399.  Section 3B1.1(b) of the Guidelines provides for a three-level upward adjustment in a defendant's base offense level if he "was a manager or supervisor (but not an organizer or leader)" of the criminal activity.  U.S.S.G. § 3B1.1(b).  Factors the district court should consider in determining whether an upward adjustment is appropriate include "the nature of the defendant's role in the offense, the recruitment of accomplices, [and] the degree of participation in planning or organizing the offense."  United States v. Ortiz-Martinez, 1 F.3d 662, 677 (8th Cir.), cert. denied, 114 S. Ct. 355 (1993).

As indicated above, the district judge heard twelve days of testimony, much of it from cooperating defendants detailing the organizational structure and functioning of the single conspiracy charged in the indictment.  That testimony revealed a highly structured, disciplined, and well-planned criminal organization involving a large number of individuals, each of whom performed fairly distinct roles.  There were lowly lumpers whose only job was to unload the semi-trucks when they arrived at one of the warehouses.  There were warehouse managers who kept track of the

incoming and outgoing marijuana inventory and who were responsible for its security. There were the well-paid, over-the-road, semi-truck drivers whose job it was to sneak the concealed cargo through the law enforcement checkpoint at Falferrias, Texas, and to transport it to its ultimate destination warehouse in Chicago, Kansas City, St. Louis, Fort Payne, Alabama, or southern Illinois. There were dispatchers who boarded the trucks after they cleared the checkpoint, informed the drivers where the load was to be delivered, stayed with the load until it was safely in the warehouse, who kept the kingpin, Mr. J., informed daily of the load's progress and who answered to his sky pages. There were persons whose sole responsibility was to carry thousands upon thousands of dollars in cash (sometimes as much as a quarter of a million dollars at a time) from the warehouse locations back to Mr. J. in south Texas. In some instances, there were others who "owned" the load and for whom the conspiracy only acted as freight forwarders, collecting fees for transporting the marijuana and for factoring the transactions. There were area coordinators who informed the brokers that the product was available. There were the brokers like Flores who brought their customers (who were large scale dealers) to the warehouse sites and who arranged for the wholesale sales and distribution to their customers. The jury convicted Flores of being a member of this overall intricate conspiracy, and it was the district judge's responsibility to determine what Flores' role was in the offense of conviction, i.e., where he fit in the scheme of the conspiracy's criminal activity. As his sentencing comments indicate, the experienced district judge was well aware of the need to make relative judgments about the role in the conspiracy offense each of the more than 12 defendants played that he had to sentence in this case.

We conclude that the district court's determination that Flores' role in the conspiracy merits a three-level enhancement pursuant to U.S.S.G. § 3B1.1(b) is not clearly erroneous. As the

facts delineated above illustrate, Flores solicited a substantial buyer on behalf of the drug ring, helped finance the trip, played an integral and extensive role in planning the transaction with the Trevinos and Jackson, determined the price for the quantity of marijuana sold to Jackson along with arranging for a sizeable portion of the quantity to be "fronted," and finally, personally managed and ensured that the $200,000 deal got done.[6]   Thus, Flores' claim that the district court erred by imposing a three-level upward adjustment is without merit.[7]

### III.

For the reasons enumerated above, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[6]Flores admits as much in his brief, stating that "[t]he Government's evidence suggests that Appellant located a buyer and facilitated a transaction much as a real estate agent will solicit listings and will broker a transaction."  (Appellant's Br.  at 30.)  Thus, Flores acknowledges that he was not merely a bit player in the conspiracy.

[7]Given this disposition, we likewise conclude that the district court's decision not to award Flores a two-level reduction for being a minor participant was not clearly erroneous.  See Ortiz-Martinez, 1 F.3d at 678.

-18-