108 F.3d 1380
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Walter R. COBB, Defendant-Appellant.
 No. 96-1107.
 United States Court of Appeals, Seventh Circuit.
 Argued March 4, 1997.
Decided March 21, 1997.
 
 Before CUMMINGS, COFFEY AND ROVNER, Circuit Judges.
 
 ORDER
 
 1
 Defendant Walter R. Cobb pleaded guilty to, and was convicted of, conspiracy to possess with intent to distribute cocaine base (crack) in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2. He was sentenced to 188 months' imprisonment.[1] On appeal, Cobb argues that (1) the district court erred in holding him accountable for 2,831.5 grams of crack seized at a stash house; and (2) the sentence violated the Eighth Amendment prohibition against cruel and unusual punishment.
 
 Background
 
 2
 The conspiracy to distribute crack cocaine began in November 1991 and continued through March 1994. It involved approximately 14 coconspirators. It was primarily directed by Alan Woods, defendant Cobb's uncle, using a distribution organization between Bakersfield, California, and the Quad Cities area in Illinois and Iowa. The homes of Tammy Neeley, Yvette Pizano, and Veronica Garrard were used as stash houses for the crack cocaine.
 
 
 3
 Cobb joined the conspiracy on or about March 17, 1994, when his uncle sent him to Moline, Illinois, with Brian Hamilton, who had been distributing drugs for Woods in the Quad Cities area since October 1992. Woods kept a crew of distributors in the Quad Cities area. Woods often relied on Hamilton to watch the operation in his absence. Woods typically would send cocaine through the mail or by Federal Express from California to Hamilton in Moline, and Hamilton would oversee the distribution and sale of the crack, and send cash back to Woods. While staying in the Quad Cities, Cobb lived at the home of Pizano, who was sent by Hamilton to Neeley's to pick up crack cocaine when necessary. Cobb's involvement in the conspiracy ended on April 1, 1994, when search warrants were executed at Neeley's home.
 
 Foreseeable Quantity of Drugs
 
 4
 Cobb argues that the district court erred in determining that he could have reasonably foreseen that the conspiracy was storing 2512.8 grams of crack, the amount of drugs seized from Neeley's home upon execution of the search warrant on April 1, 1994.
 
 
 5
 The government must establish by a preponderance of the evidence the quantity of drugs that was reasonably foreseeable to each particular defendant. US v. Banks, 78 F.3d 1190, 1205 (7th Cir.1996). See also US v. Witte, 115 S.Ct. 2199, 2203 (1995). The determination of the amount of drugs attributable to a defendant is a question of fact reviewed for clear error. US v. Acosta, 85 F.3d 275, 279 (7th Cir.1996). The district court found Cobb accountable for both the amount of crack he helped Hamilton distribute or sell (which Cobb does not object to), and the amount stored at Neeley's during the two weeks that Cobb was in the Quad Cities and participating in the conspiracy. The district court expressly found that Cobb "was aware that ... drugs were being stored at Neeley's residence for Mr. Hamilton, and ... [defendant] was present when Mrs. Neeley gave these drugs to Mr. Hamilton for delivery, and at least on one occasion he himself caused drugs to be taken from Mrs. Neeley's place and given to him for distribution." These findings are supported by the written plea agreement, the presentencing report (PSR), and testimony given at the sentencing hearing. The plea agreement includes a stipulation of facts which states, in part:
 
 
 6
 [D]efendant acknowledges that he agreed with Brian Hamilton and others to distribute crack cocaine in the Quad Cities.[2] In furtherance of this agreement, in March, 1994, he and Brian Hamilton made arrangements to travel from Bakersfield, California to Moline, Illinois.... The defendant and Brian Hamilton was [sic] responsible for bringing over 50 grams of crack cocaine to the Quad Cities. This cocaine was initially brought to Yvette Pizano's residence ... [in] Moline, Illinois, and then was stored at Tammy Neeley's residence[3] ... in Rock Island, Illinois. On March 30, 1994, Yvette Pizano picked up eight ounces of the crack cocaine that was stored at Neeley's house and delivered it to Cobb at Pizano's residence for further distribution. Cobb and a confidential source left Pizano's residence with the crack cocaine and met and delivered the eight ounces to Paul Hamilton at a restaurant located in Davenport, Iowa.
 
 
 7
 (R.17, pp. 4-5). Cobb testified at the sentencing hearing that at the March 30, 1994 sale, he was filling in for Hamilton: "Because he wasn't there, you know, and I was doing that for him, but if he would have been there he would have done that." This makes it even more likely that Cobb knew that drugs were being kept at Neeley's, since he had to direct Pizano to go to Neeley's to pick up the eight ounces.
 
 
 8
 In addition, Pizano testified at the sentencing hearing that after arriving with Cobb on March 17, 1994, Hamilton asked Pizano to contact Tammy Neeley. Neeley arrived, and took a package from Hamilton. Pizano later went to Neeley's three or four times and took small amounts of the drugs from that package, which was kept at Neeley's. Once, after Pizano returned from Neeley's home with drugs, Hamilton gave the drugs to Cobb in the presence of Pizano. The other times, Pizano handed the drugs to Hamilton when she returned from Neeley's, in the presence of Cobb. The packages containing crack cocaine were wrapped in clear plastic wrap. Pizano testified further about Cobb's knowledge that the drugs were kept at Neeley's:
 
 
 9
 Q. Now, was Walter [Cobb] aware that the drugs were not at your place but were somewhere else?
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 A. Yes.
 
 
 13
 Q. And why is it that you believe that, Yvette? Why is it that you think Walter knew the drugs were elsewhere?
 
 
 14
 A. Because he called and asked for a certain amount and how long would it take to go get them.
 
 
 15
 Q. Okay. So you [sic] knew you had to go somewhere to get them?
 
 
 16
 A. Yes.
 
 
 17
 (S.Tr. 45). We conclude that the district court was entitled to find that Cobb knew that drugs were being stored by Hamilton at Neeley's. See US v. Clavis, 956 F.2d 1079, 1097 (11th Cir.1992) (defendant accountable for cocaine stored at a stash house maintained by coconspirators, since defendant could foresee that the cocaine he distributed was being brought from elsewhere).
 
 
 18
 Cobb next argues that he did not how much crack was stored at Neeley's. It is not necessary to find that Cobb knew the precise amount of crack cocaine that was stored at Neeley's. See, e.g., US v. Sailes, 872 F.2d 735, 738 (6th Cir.1989) (for sentencing purposes, entire amount of cocaine seized at defendant's home attributed to defendant, who permitted her son to sell cocaine from her home, although she had no specific knowledge that 780 grams were stored in her home).[4]
 
 
 19
 This is not a case where defendant was held accountable for drugs sold prior to his joining the conspiracy. Cobb was held accountable only for the quantity of drugs stored in Neeley's house during the two weeks that Cobb was involved in the conspiracy. See US v. Flores, 73 F.3d 826, 833 (8th Cir.1996). The fact that these drugs might have been stored at Neeley's prior to Cobb's arrival in the Quad Cities does not alter our analysis. Cf. US v. McDuffy, 90 F.3d 233, 236 & n. 2 (7th Cir.1996) (clear error to hold defendant accountable for full amount of marijuana associated with the "far reaching conspiracy" since he was involved with only a single purchase, and link to conspiracy may have been no more than "a simple buyer-seller relationship").
 
 
 20
 Also, Cobb was not brought into the conspiracy for a single deal. The plea agreement indicates that Cobb agreed with Hamilton and others to come to the Quad Cities for the purpose of distributing crack cocaine. He intended to conduct future transactions, but the government deprived him of this opportunity when it confiscated the drugs stored by the conspirators. See Flores, 73 F.3d at 834 (defendant "had no such limited agreement, explicit or implicit, when he joined the conspiracy, viz., that he was only in for a single deal"; defendant "intended to conduct future transactions with the [coconspirators] and was simply deprived of the opportunity to do so because he was arrested").
 
 
 21
 Moreover, Pizano testified that during the period of time Cobb was living at Pizano's home, and spending "every day" with Hamilton, who was distributing and selling drugs on a regular basis, Pizano went to Neeley's home numerous times, including 7 trips in a one-week period. During this time, Hamilton sold at least 258 grams, and Cobb made a solo sale of eight ounces. Also, Hamilton and Cobb brought 50 grams to Moline from California, and that amount was stored at Neeley's.
 
 
 22
 The district court made a permissible inference that a distributor who sees various amounts of marijuana going to, and coming from, a stash house would reasonably foresee (if not actually know) that larger quantities of the drugs were kept at that location. The amounts Cobb and Hamilton needed for sales, including the eight-ounce sale he handled alone on March 30, 1994, were always available; thus he could reasonably foresee that larger amounts were kept there during the portion of time he was involved in the life of the ongoing conspiracy. See US v. Flores, 73 F.3d 826, 834 (8th Cir.1996) (in view of defendant's "knowledge that the marijuana operation could readily satisfy orders for large quantities of marijuana, he had to have realized that significant quantities were stored" at the secluded warehouse; and defendant "knew that his customer was not the only individual who was going to be serviced by the" warehouse).
 
 
 23
 Cobb also points out that the district court allowed a two-point reduction for his role in the offense as a minor participant. Although Cobb's role might have been minor when compared with other coconspirators' roles, he did more than simply accompany Hamilton on drug buys. As the government argued at the sentencing hearing, when Hamilton was out of town, Cobb "stepped in and assumed ... the role [of decision] maker at that point in time." We conclude that no clear error occurred.
 
 Eighth Amendment & Crack Cocaine
 
 24
 Cobb argues that his sentence violates the Eighth Amendment because of the disparity in sentencing between crack cocaine and pure cocaine. This court has rejected this argument, and similar arguments, in several cases. US v. Baker, 78 F.3d 1241, 1248 (7th Cir.1996); US v. Smith, 34 F.3d 514, 525 (7th Cir.1996); US v. Lawrence, 951 F.2d 751 (7th Cir.1991). See also US v. Jackson, 103 F.3d 561, ---- (7th Cir. Dec. 26, 1996), 1996 WL 736472 at * 10; US v. Booker, 73 F.3d 706, 710 (7th Cir.1996) (disparity does not create equal protection or due process violation); US v. Reddrick, 90 F.3d 1276 (July 25, 1996) (per curiam).
 
 
 25
 Cobb also argues that, even if there is no facial unconstitutionality, the sentencing laws were applied to him in such a way that the sentence violated the Eighth Amendment. See Harmelin v. Michigan, 501 U.S. 957 (1991); Solem v. Helm, 463 U.S. 277 (1983). Cobb argues that his minimal role was merely that of a "delivery boy," and the deliveries with which he was connected involved only 344.6 grams of crack. He asks that the court require "specific proof that the defendant has substantially participated in its manufacture and/or distribution, not mere conjecture." Cobb adds: "To so tenuously connect a defendant with reasonable foreseeability may lead to such injustice as in Cobb's case as to border on infliction of cruel and unusual punishment." This is merely a different form of the reasonable foreseeability argument, which we reject for the reasons discussed above.
 
 Downward Departure
 
 26
 Finally, Cobb asks that the district court be ordered to depart downward due to the "blatant irrationality" of the sentence, since "Congress did not intend to punish someone who happened to be in the wrong place at the wrong time." This court does not have jurisdiction to review a district court's refusal to depart downward. U.S. v. Larkins, 83 F.3d 162, 168 (7th Cir.1996).
 
 Conclusion
 
 27
 The district court judgment is AFFIRMED.
 
 
 
 [1]
 This included a three-level adjustment for acceptance of responsibility, an adjustment which had not been recommended in the presenting report
 
 
 [2]
 Cobb testified otherwise at the sentencing hearing. He stated that he came to the Quad Cities because Hamilton wanted to go there "to see his kids." However, at the change of plea hearing, Cobb testified that the facts set out in the plea agreement were accurate
 
 
 [3]
 At the sentencing hearing, the district court made a finding that there was "no evidence that the drugs distributed by Cobb on March 30, 1994, came from Neeley's residence. But that finding doesn't change or affect the drug quantity" to be attributed to Cobb. S.Tr. 18, lines 9-14
 
 
 [4]
 Cobb's position is similar to that taken by defendants accused of constructive possession, where they knew some amount of drugs was kept in a certain location, such as a house or a vehicle, but did not know how much drugs were stored at a particular location. See, e.g., US v. DeLaCruz, 996 F.2d 1307, 1314 (1st Cir.1993) ("defendant who conspires to transport for distribution a large quantity of drugs, but happens not to know the precise amount, pretty much takes his chances that the amount actually involved will be quite large")