# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1058

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Fontaine Demmond Sherman, | * |
| | * |
| Appellant. | * |
| | * |
| | * |
_____

No. 05-1072

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Tremayne Scoggins, also known as | * |
| Scruff, | * |
| | * |
| Appellant. | * |

* Appeals from the United States
* District Court for the
* Eastern District of Arkansas.

_____

Submitted: October 11, 2005
Filed: March 15, 2006

_____

Before RILEY, HANSEN, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Fontaine Diamond Sherman and Tremayne Scoggins were convicted after a jury trial of conspiring to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841 and 846. Scoggins was also convicted of using a communication facility to facilitate the commission of a drug offense, in violation of 21 U.S.C. § 843(b). Sherman was sentenced to 240 months' imprisonment, and Scoggins was sentenced to a term of 360 months. After considering their appeals, we affirm the district court's judgment with respect to Sherman. We also affirm Scoggins's conviction, but we vacate his sentence and remand for resentencing in accordance with *United States v. Booker*, 543 U.S. 220 (2005).

I.

Scoggins and Sherman were indicted, along with fourteen others, for various offenses arising out of an FBI investigation of drug trafficking activities in central Arkansas from January 1997 through December 2, 2001. According to the government's theory at trial, Scoggins purchased cocaine and cocaine base from suppliers, including Sherman, in Bakersfield, California, and returned to central Arkansas. Scoggins then converted portions of the cocaine into cocaine base and distributed the cocaine powder and cocaine base to his associates, some of whom distributed the drugs.

Eleven of the sixteen defendants pled guilty. A superseding indictment charged Sherman, Scoggins, and Larry Brown (who was eventually acquitted) with conspiring to distribute and possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base. Scoggins also was charged with three counts of

distributing various quantities of cocaine base, and both Scoggins and Sherman were charged with using a communication facility to commit a drug felony. Apparently because of uncertainty in the law after the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), the indictment also included allegations concerning sentencing issues to be determined under the United States Sentencing Guidelines. Specifically, the indictment charged that Scoggins and Sherman were organizers and leaders of the criminal activity, *see* USSG § 3B1.1, and that Scoggins possessed a dangerous weapon during the period of the conspiracy, *see* USSG § 2D1.1(b). The jury returned a guilty verdict against Scoggins and Sherman on the drug conspiracy charge, but was unable to agree unanimously on a drug quantity. It found Scoggins guilty of the communications facility charge. The jury also found that Scoggins was an organizer or leader of a criminal activity that involved five or more participants, and that he possessed a dangerous weapon during the period of the conspiracy. The court sentenced Scoggins to 360 months' imprisonment for the conspiracy and 48 months for the use of a communications facility, to run concurrently. Sherman was sentenced to 240 months' imprisonment.

## II.

### A.

Scoggins first argues that the district court did not have subject matter jurisdiction to submit the sentencing issues to the jury. The district court plainly had jurisdiction over the criminal case, pursuant to 18 U.S.C. § 3231, which gives the district courts original jurisdiction "of all offenses against the laws of the United States." Whether the court committed a procedural error by submitting certain issues to the jury within the criminal case is a question independent of the court's subject matter jurisdiction over the action.

Scoggins does contend that the submission of the sentencing issues to the jury was an improper trial procedure that violated his rights under the Sixth Amendment. He claims it was error for the court to read to the jury allegations from the indictment that pertained only to sentencing issues, and that the jury instructions on these issues were inadequate. The government asserts that because this case was tried after *Blakely*, but before the Supreme Court's decision in *Booker*, the district court acted correctly under the law at the time of the trial.

Although there was ambiguity in the law before *Booker* was decided, we consider Scoggins's argument in light of law as it has developed by the time of this appeal. *United States v. O'Malley*, 425 F.3d 492, 495 (8th Cir. 2005). It is now clear, under the advisory guidelines scheme announced in *Booker*, that allegations concerning adjustments under the sentencing guidelines need not be included in an indictment or submitted to a jury. *United States v. Haack*, 403 F.3d 997, 1003 (8th Cir. 2005). Accordingly, we analyze the inclusion of these matters in the indictment as surplusage, *United States v. Bates*, 77 F.3d 1101, 1105 (8th Cir. 1996), and we will find error only if the surplusage is prejudicial and the district court abused its discretion in failing to strike it. *United States v. Washington*, 992 F.2d 785, 787-788 (8th Cir. 1993).

Scoggins argues that submission of evidence to the jury concerning his role in the offense and possession of a dangerous weapon was prejudicial. We disagree, because the disputed evidence would have been admissible as relevant to the charged drug conspiracy, regardless of whether the jury was asked to make specific findings on those sentencing issues. There is a well-known connection between firearms and drug trafficking, and we often have held that evidence of firearms is relevant and admissible in a prosecution of drug trafficking charges. *E.g.*, *United States v. Ruiz*, 412 F.3d 871, 880-81 (8th Cir. 2005); *United States v. Barry*, 133 F.3d 580, 582 (8th Cir. 1998); *United States v. Milham*, 590 F.2d 717, 721 (8th Cir. 1979). Evidence about Scoggins's role in the offense is part and parcel of the proof that he was a

member of the conspiracy. Therefore, the jury was entitled to hear this evidence whether or not the sentencing issues were under consideration. We note, moreover, that the jury was asked to consider the sentencing issues only after it determined whether Scoggins was guilty of the charged conspiracy offense, and this sequence makes it unlikely that the district court's highlighting of the sentencing issues caused any prejudice to Scoggins.

Scoggins further contends that the jury instructions improperly allowed the jury to convict him of the charged conspiracy without finding the requisite quantity of drugs. Jury instruction number 9, however, did list quantity as the fourth element of the conspiracy offense, and provided that the jury must find that "the agreement or understanding involved in excess of 5 kilograms of cocaine or more than 50 grams of cocaine base." *See* 21 U.S.C. § 841(b)(1)(A); *United States v. Serrano-Lopez*, 366 F.3d 628, 638 (8th Cir. 2004) (explaining that drug quantity is an element of the offense if it "can and does lead to the imposition of a sentence greater than the otherwise applicable statutory maximum."). The jury returned a verdict of guilty on the conspiracy charge, thus indicating that it found unanimously that the offense involved more than 5 kilograms of cocaine or 50 grams of cocaine base. The verdict form then asked the jury, for sentencing purposes, to find whether the quantity of cocaine base was (a) more than 1.5 kilograms, (b) more than 500 grams but less than 1.5 kilograms, (c) more than 150 grams but less than 500 grams, or (d) more than 50 grams but less than 150 grams. The jury answered that it was unable to agree unanimously beyond a reasonable doubt on this question.

That the jury was unable to agree on an answer to the question concerning drug quantity on the verdict form does not undermine the jury's finding of guilt on the charged conspiracy, including the element that the conspiracy involved more than 50 grams of cocaine base or 5 kilograms of cocaine. The inability to choose one of several specific increments of quantity, all of which involved more than 50 grams of cocaine base, does not suggest that the jury was unable to understand its duty to

decide whether the conspiracy involved more than 50 grams of cocaine base (or 5 kilograms of cocaine) in order to find Scoggins guilty of the charged offense. There is no reasonable likelihood that the instructions confused the jury, and we therefore reject this challenge to the verdict.

B.

Scoggins next argues that the district court erred by not granting his motions for a mistrial based on allegedly improper comments made by two witnesses. Prior to the testimony of the first, Anthony Flowers, Scoggins moved to prevent Flowers from testifying that Scoggins had shot a man. The district court agreed that the reference would be prejudicial and directed the prosecutor to instruct Flowers not to mention the shooting. Despite this instruction, when asked how he knew that Scoggins carried a gun, Flowers blurted out "he always shot it. He shot a guy in —." (T. Tr. at 344-345). At this point, the prosecutor interrupted Flowers, and the court, after denying a motion for mistrial, gave a cautionary instruction admonishing the jury to disregard the testimony.

Scoggins also moved prior to the testimony of witness Courtney Johnson to exclude prejudicial testimony, and the court admonished Johnson not to mention the word "gang," the names of any specific gangs, or shootings. During his testimony, when asked why he carried a pistol, Johnson stated "[b]ecause somebody told me [Scoggins] was going to shoot me because I supposed to have broke in his house." (T. Tr. at 740). Scoggins did not object. Then, on cross-examination, when a co-defendant's attorney asked Johnson whether he was being paid by the FBI for his assistance in other matters, he acknowledged assisting in drug cases unrelated to this conspiracy, and in "a murder case that has something to do with this." (T. Tr. at 753). Scoggins's attorney objected, the court admonished the jury to disregard the answer, and Scoggins moved for a mistrial, which the court denied.

-6-

The exposure of a jury to improper testimony ordinarily is cured by measures less drastic than a mistrial, such as an instruction to the jury to disregard the testimony, *United States v. Flores*, 73 F.3d 826, 831 (8th Cir. 1996), and the denial of a motion for a mistrial is reviewed for an abuse of discretion. *Id.* We determine the prejudicial effect of any improper testimony by examining the context of the testimony and the prejudice created by it, as juxtaposed against the strength of the evidence of the defendant's guilt. *United States v. Nelson*, 984 F.2d 894, 897 (8th Cir. 1993). Here, the evidence of the defendant's guilt was substantial, and the district court acted promptly to strike the allegedly improper testimony and to instruct the jury to disregard it. Flowers's reference to Scoggins shooting a gun was fleeting and immediately interrupted by the prosecutor. Scoggins did not object when Johnson first referred to shooting, and the second statement, to which Scoggins did object, only inferentially might have implicated Scoggins. The allegedly prejudicial comment merely referred to a murder investigation that "had something to do" with a trial involving three separate defendants. The court promptly instructed the jury to disregard the statements. These three comments must be considered in the context of the entire trial, which provided substantial evidence of Scoggins's guilt, including testimony concerning controlled drug purchases from Scoggins, recordings of Scoggins negotiating drug transactions with co-conspirators on the telephone, and testimony of multiple co-conspirators implicating Scoggins in the drug trafficking conspiracy.

Scoggins points to *United States v. Conley*, 503 F.2d 520 (8th Cir. 1974), for the proposition that repeated references to "killings" by two government witnesses is prejudicial error requiring reversal. *Conley*, however, involved highly prejudicial testimony by a law enforcement agent that could "hardly be characterized as an inadvertent slip of the tongue." *Id.* at 523. The district court in *Conley* also had overruled an objection to the agent's first reference to "killings" and ignored the defense counsel's request for curative action at the second. *Id.* We are unpersuaded that the disputed testimony in Scoggins' trial, ambiguous as it was and tempered by

cautionary instructions, was so egregious as to warrant a conclusion that the district court abused its discretion in refusing to grant a mistrial.

C.

Scoggins next argues that the district court erred in not granting a third motion for a mistrial, this time based on the prejudicial impact of publicity relating to gangs and gang activity, as well as the collective impact of all the alleged trial errors. During the trial, several articles in local newspapers focused on gang activities and violence in the Little Rock area. The articles provided maps of some of the areas described in Scoggins's trial, listed definitions of the gangs, discussed Mexican drug connections, described how drugs were transported from California, and mentioned houses in which gangs met. Scoggins claimed that the articles mirrored the evidence presented in his trial, and he moved for a mistrial prior to the jury's deliberations. The court denied the motion because neither the defendants nor the town primarily involved in this case were mentioned in the articles, and the court had instructed the jury repeatedly to decide the case only on the evidence presented in court. The court again admonished the jury to ignore anything heard or seen outside the courtroom, and directed it to begin deliberations.

We review the denial of a motion for a mistrial based on publicity for abuse of discretion. *United States v. Williams*, 604 F.2d 1102, 1114-15 (8th Cir. 1979). Publicity during trial presents a greater risk of prejudice than pre-trial publicity, but an article that is unconnected with the trial and does not refer specifically to the defendants is not inherently prejudicial. *Id.* at 1114. The district court reviewed the principal article cited by Scoggins and determined that there was no mention of any of the defendants or witnesses involved in the trial. There was no evidence that any member of the jury had seen or read the articles. The articles were thus unconnected to the trial, and the district court did not abuse its discretion by denying the motion for a mistrial.

Scoggins also claims that the "collective impact" of the publicity, the allegedly prejudicial comments by witnesses, and the improper trial structure was sufficient to warrant a mistrial. Scoggins relies on *United States v. Richardson*, 651 F.2d 1251, 1253 (8th Cir. 1981), which held that the collective impact of prejudicial in-trial publicity and the appearance, in a wheelchair, of a witness who had been wounded outside her home during the trial were so damaging to the defense case that a mistrial was required. In *Richardson*, however, the publicity referred directly to the trial and described threats against a witness because of her expected testimony. Here, the publicity does not refer directly to Scoggins or any witnesses in the trial, and for the reasons discussed, the other alleged errors were adequately addressed by the striking of testimony and cautionary instructions.

D.

Scoggins contends finally that all three alternative sentences imposed by the district court violate the Sixth Amendment and are inconsistent with *Booker*. We agree that none of the sentences correctly applies *Booker*, and we conclude that resentencing is warranted.

The district court imposed three alternative sentences: (1) 360 months, the minimum sentence allowed under a mandatory guideline system using facts found by the jury, (2) life imprisonment, the minimum sentence allowed under a mandatory guidelines system using the judge's determination of drug quantity by a preponderance of the evidence, plus the enhancements for role in offense and the firearm possession, and (3) 360 months, if the guidelines were "totally unconstitutional," and the court did not "have to worry about *Blakely* or the Guidelines or anything." (S. Tr. at 35-37). Scoggins made a "*Blakely* objection" to the district court's imposition of sentence, thus preserving error based on *Booker*. *United States v. Pirani*, 406 F.3d 543, 549 (8th Cir. 2005) (en banc).

None of the three alternative sentences anticipated the remedy announced in *Booker*. The first and second alternatives were premised on a mandatory application of the guidelines, and these approaches are erroneous in light of *Booker*'s holding that the guidelines are effectively advisory. The third alternative presumed that the guidelines were totally unconstitutional and should not be considered at all. It appears, therefore, that the court did not consider and take into account the guidelines as advisory when arriving at the third alternative sentence. To be sure, if the advisory guideline range is life imprisonment, it would not seem to help Scoggins for the court to give more consideration to the advisory range. But Scoggins nonetheless has sought resentencing, perhaps because he believes the court also did not fully appreciate its ability to consider other sentencing factors set forth in 18 U.S.C. § 3553(a). The government makes no argument that the *Booker* error was harmless. Accordingly, we vacate Scoggins's sentence and remand for resentencing consistent with *Booker*.

Scoggins also objects to the district court's conclusion regarding his criminal history score. He contends that several of the criminal history points attributed to him were based on "extensions of probation" that should not qualify as "prior sentences" for purposes of counting criminal history points. *See* USSG § 4A1.1. Scoggins correctly notes that if a defendant objects to facts alleged in a presentence report, then the government may not rely on the report alone, and must present evidence to prove the disputed facts by a preponderance of the evidence. *United States v. Stapleton*, 268 F.3d 597, 598 (8th Cir. 2001). The record is unclear, however, whether Scoggins objected to the fact of the prior sentences or merely to the legal significance of undisputed facts. (S. Tr. at 12-14). Because the case must be remanded for resentencing in any event, we decline to express an opinion at this time regarding the district court's computation of criminal history. *See United States v. Huber*, 404 F.3d 1047, 1063 (8th Cir. 2005) ("Because the district court might impose a different sentence on remand, and because the parties might choose not to appeal that sentence, consideration of objections to the court's original guidelines calculations would be

premature at best and unnecessary at worst.") (quoting *United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005)).

## III.

In his appeal, Sherman argues that there was insufficient evidence to support his conviction for conspiring to distribute and possess with intent to distribute cocaine and cocaine base. We view the evidence "in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. Mickelson*, 378 F.3d 810, 820 (8th Cir. 2004) (internal quotation omitted). We will reverse a conviction for insufficient evidence only if no reasonable juror could have found the defendant guilty. *United States v. Dabney,* 367 F.3d 1040, 1042 (8th Cir. 2004).

To convict Sherman of conspiring to distribute or possess with intent to distribute cocaine and cocaine base, the government was required to prove that two or more persons reached an agreement to distribute or possess with intent to distribute the cocaine and cocaine base, that the defendant voluntarily and intentionally joined the agreement, and that at the time that the defendant joined the agreement he knew its essential purpose. *United States v. Aguilar-Portillo*, 334 F.3d 744, 747 (8th Cir. 2003). Evidence of association between the defendant and conspirators, while not sufficient alone to establish a conspiracy, is clearly relevant. *Mickelson*, 378 F.3d at 821.

The evidence in this case supports a finding that Sherman knowingly and voluntarily joined a conspiracy to distribute cocaine. Scoggins obtained cocaine in Bakersfield and returned to Arkansas to distribute it. The government alleged that for some time during the conspiracy, Sherman supplied cocaine to Scoggins, and several

witnesses provided evidence that collectively supported an inference that the defendants indeed undertook this arrangement.

Jason Shiver testified that Sherman supplied him with cocaine in Bakersfield to distribute in 1994, 1996, 2000, and 2001. He stated that Scoggins showed him how to cook cocaine in Bakersfield, that Scoggins traveled back and forth between Bakersfield and Arkansas, and that in 1997 or 1998, Scoggins had invited Shiver to come to Arkansas and sell cocaine for him. Shiver testified that he knew Scoggins and Sherman were doing "drug business" together, because he saw them get into each other's vehicles and exchange money. Shiver also testified that Sherman had mentioned that Scoggins owed him $7000, which Shiver inferred from the context was probably money for drugs. Shiver also explained that while he and Sherman were in prison together in Laredo and Bakersfield in 2001, Sherman "[t]hreatened something might happen to [Shiver's] mom," if Shiver testified against him. (T. Tr. at 488).

Lud Lovell, another prosecution witness, testified that he had seen both Sherman and Scoggins sell cocaine in Bakersfield during the time of the conspiracy. He testified that Sherman bragged to him about his Mexican cocaine connections. Lovell stated that he bought cocaine from Scoggins, and that Scoggins claimed to be "doing big things" and "going here and there," which Lovell took to mean Scoggins was transporting cocaine from California to Arkansas. (T. Tr. at 517). Kenyatta Green, another associate of Scoggins, testified specifically that he had traveled with Scoggins from Arkansas to California to obtain cocaine that was returned to Arkansas for redistribution.

During its investigation, the government obtained an order authorizing the interception of telephone conversations on Sherman's girlfriend's phone and on his cell phone. In one conversation between Sherman and Scoggins produced at trial, Sherman told Scoggins that "Don Don," identified as Donald Parish, owes him "five big ones." (Gov't Exh. 6A, at 5). Sherman also informed Scoggins that he was

"trying to break free of these fools with my money," referring to "the Mexicans." (*Id.* at 2). Law enforcement agents who conducted surveillance during the investigation also testified that they observed Sherman and Scoggins together on several occasions in Bakersfield.

Taking this evidence in the light most favorable to the verdict, a reasonable juror could infer that Sherman obtained cocaine from a Mexican source and served as a source of supply for Scoggins, who redistributed the drugs in Arkansas. Sherman admitted to Lovell that he had "Mexican cocaine connections," and a jury could infer that Sherman's statements to Scoggins concerning Parish's debt of "five big ones," and his desire to "break free" of Mexicans, referred to the operations of the drug conspiracy. Given the evidence that both Sherman and Scoggins were involved in drug trafficking, and in light of the recorded communications between them, a jury reasonably could infer that financial transactions between Scoggins and Sherman were drug-related, and that Scoggins's debt to Sherman was for cocaine that Sherman had supplied. Sherman's threat to harm Shiver's mother in retaliation for testimony against Sherman was further evidence from which a jury could infer Sherman's involvement in the conspiracy. *United States v. Montano-Gudino*, 309 F.3d 501, 505 (8th Cir. 2002). There was sufficient evidence to support the verdict.

Sherman also argues that the district court erred by enhancing his statutory minimum sentence based on a prior conviction for a drug felony, *see* 21 U.S.C. § 851, because the fact of the conviction was found by the court rather than by a jury. The Supreme Court's decision in *Almendarez-Torres v. United States*, 523 U.S. 224 (1988), as well as our recent decisions following that precedent, *see, e.g.*, *United States v. Johnson*, 408 F.3d 535, 540 (8th Cir. 2005); *United States v. Velazquez*, 410 F.3d 1011, 1016-17 (8th Cir. 2005), govern this issue. These holdings permit the court, consistent with the Sixth Amendment, to make findings concerning the fact of a prior conviction. Accordingly, there was no error in the court's imposition of Sherman's sentence.

-13-

\*      \*      \*

For the foregoing reasons, we affirm Sherman's conviction and sentence, affirm Scoggins's conviction, and remand for resentencing of Scoggins in accordance with *Booker* and 18 U.S.C. § 3553(a).

_____